SUPREME COURT OF ARIZONA
En Banc

<table>
<tr><td>STATE OF ARIZONA,</td><td>)</td><td>Arizona Supreme Court</td></tr>
<tr><td></td><td>)</td><td>No. CR-99-0551-AP</td></tr>
<tr><td>Appellee,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>Pima County Superior</td></tr>
<tr><td>v.</td><td>)</td><td>Court</td></tr>
<tr><td></td><td>)</td><td>No. CR-61452</td></tr>
<tr><td>MARCUS LASALLE FINCH,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Appellant.</td><td>)</td><td>**O P I N I O N**</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>_____</td><td>)</td><td></td></tr>
</table>

Appeal from the Superior Court of Pima County
Honorable Bernard P. Velasco, Judge
AFFIRMED

_____

Janet Napolitano, Attorney General                    Phoenix
By   Kent E. Cattani, Chief Counsel
     Capital Litigation Section
and  Jack Roberts, Assistant Attorney General
Attorneys for the State of Arizona

Law Office of S. Jonathan Young, Esq.                  Tucson
By   S. Jonathan Young
Attorney for Finch

_____

M c G R E G O R, Vice Chief Justice

¶1      A grand jury charged Marcus Finch with fifty-six counts of armed robbery, kidnaping, aggravated assault, and attempted first degree murder for three robberies that occurred in Tucson on April 12, 24, and 28 of 1998. He was also charged with one count of first degree murder for the death of Kevin Hendricks that occurred during the April 28 robbery. The trial court consolidated all three incidents for a dual jury trial with Finch's co-

defendant, Keith Phillips. Finch's jury convicted him of first degree felony murder, as well as most of the non-homicide counts. Following a sentencing hearing, Judge Bernard P. Velasco sentenced Finch to death on December 6, 1999. Appeal to this court is automatic and direct when the court imposes a sentence of death. Arizona Revised Statutes (A.R.S.) § 13-703.01 (2001). We exercise jurisdiction pursuant to Article 6, Section 5.3 of the Arizona Constitution, A.R.S. section 13-4031 and Arizona Rule of Criminal Procedure 31.2(b).

**I.**

**A.**

¶2 Around 1:30 a.m. on April 12, 1998, Finch and Phillips entered the Famous Sam's restaurant on Silverbell and Grant in Tucson. Finch, who was carrying a sawed-off rifle, and Phillips, carrying a handgun, ordered two of the four restaurant employees into the cooler. When waitress Shelly Raab saw Finch, she dropped to her knees about one arm's length away from him. Finch pointed the sawed-off rifle at her chest, said, "Get in the cooler, bitch," and shot her in the chest. Next, Finch grabbed Raab by the hair and dragged her into the cooler.

¶3 After taking the employees to the cooler, Finch and Phillips held office manager Beverly Rochon at gunpoint and told her to lead them to the money. Rochon gave them all the money she could find and went back into the cooler. Finch and Phillips left

2

shortly thereafter.

¶4    Shelly Raab survived, but the bullet fragmented her liver, lung and stomach, caused her to lose her spleen, a kidney, and part of her pancreas.  Raab's injuries have left her with a permanent limp and frequent numbness in her legs.

**B.**

¶5    At 10:30 p.m. on April 23, 1998, Phillips came into the Firelight Lounge on Wetmore in Tucson and asked what time the bar closed.  Jaimi Ramirez Gilson, the bartender, told him that she closed at 1:00 a.m.  Two hours later, Finch walked into the bar and asked for a Killian's Red beer.  When Ms. Gilson stepped into the cooler to get the beer, Phillips came in the front door with a sawed-off rifle and shouted, "Everybody on the fucking floor or I'm going to blow your brains out."  Ms. Gilson tried to hide behind the bar but Finch, who had a handgun, grabbed her by the hair, dragged her to the cash register, and told her to open it.  After taking the money, Finch dragged Ms. Gilson to the men's restroom and threw her inside.

¶6    Meanwhile, Phillips took money from the customers and herded them into the women's restroom when he learned there was no cooler large enough to hold them.  As patron Bill Gilson was entering the women's restroom, Phillips shot him once in the shoulder and once in the back.  Gilson fell into the restroom, where other patrons assisted him.  Finch and Phillips left the bar,

3

and the police arrived shortly thereafter.

¶7     Bill Gilson survived, but one of the bullets collapsed his right lung.  In addition, he lost his spleen and part of his liver and remained in a coma for three weeks.

### C.

¶8     Around midnight on April 28, 1998, Finch walked into the Famous Sam's located at Cardinal and Valencia in Tucson and asked Margaret Damron, the bartender, how much a Killian's Red beer cost. When she answered, he told her he was going back to his car to get some change.  When Finch returned, he sat down and ordered a beer. A few minutes later, Phillips walked through the front door with a sawed-off rifle and opened fire directly into the backs of customers seated at the bar.  Phillips shot Ricardo Herrera in both arms and Mario Rodriguez in one arm.  Finch, armed with a handgun, suddenly emerged from a restroom and told one patron, "Get down or I'll fucking shoot you."  Finch then saw two customers, Preston Juan and Kevin Hendricks, fleeing out the back door.  Finch followed them outside and shot Hendricks in the back twice.  After returning to the restaurant, Finch forced several patrons into the walk-in cooler and Phillips held Damron at gunpoint until she gave him all the money from the restaurant office.

¶9     Shortly after midnight on April 28, 1998, Pima County Sheriff's Deputy Jeff Englander received a dispatch stating that shots had been fired at the Famous Sam's on Cardinal and Valencia.

4

When he arrived at the restaurant's parking lot, he saw a gold Chrysler LeBaron speeding out of the lot. Englander pursued the LeBaron until it finally pulled over and stopped. Englander ordered Finch and Phillips out of the car and took them into custody. Inside the car Englander found money, an empty gun holster on the driver's side where Finch had been sitting, and a sawed-off rifle on the passenger side where Phillips had been seated. Deputy Thomas Adduci, who searched the LeBaron pursuant to a search warrant, found a .380 caliber handgun with a live round in the chamber and three more in the magazine as well as .22 caliber ammunition.

¶10 Some time after Deputy Englander took Finch and Phillips into custody, dispatch informed him that a mall security guard had found a body in the rear parking lot of Famous Sam's. The parties stipulated it was the body of Kevin Hendricks. Hendricks died of two gunshot wounds. One bullet entered the right side of Hendricks' back, punctured his right lung, and exited below his collarbone. The other entered the upper part of the left side of his back and lodged in his left lung.

**D.**

¶11 Finch confessed to all three robberies. At trial, testifying before his jury only, he admitted participating in the robberies, shooting Shelly Raab and shooting Kevin Hendricks. Finch stated that he shot Hendricks twice in the back to prevent

5

him from telling anyone that a robbery was taking place. Finch's jury convicted him of several counts of attempted first degree murder, aggravated assault with a deadly weapon, aggravated assault with serious physical injury, kidnaping, armed robbery, and one count of first degree felony murder.

¶12 Following a sentencing hearing, the trial court found that the State had proved beyond a reasonable doubt the existence of statutory aggravating factors under A.R.S. sections 13-703.F.5 (expectation of pecuniary gain) and 13-703.F.2 (prior conviction of a serious offense).[1] Furthermore, the trial court found that Finch failed to prove any statutory mitigation, and that the few proved nonstatutory mitigating factors did not warrant leniency. The court concluded that either of the two aggravating circumstances was sufficient in itself to outweigh the mitigating factors.

## II.

### A.

¶13 Finch asserts that because officers continued to question him after he made a clear and unambiguous request for counsel the trial court should have excluded his confession. We will not reverse a trial court's ruling on the admissibility of a confession absent clear and manifest error. *State v. Eastlack*, 180 Ariz. 243, 251, 883 P.2d 999, 1007 (1994).

---

[1] Ariz. Rev. Stat. (A.R.S) section 13-703 has been revised so that the F.5 and F.2 aggravators are now located at sections 13-703.G.5 and 13-703.G.2.

¶14     When a suspect invokes his right to a lawyer, all questioning must cease. *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S. Ct. 1880, 1883 (1981).  If the suspect reinitiates contact with the police, however, he waives his right and questioning may continue.  *Oregon v. Bradshaw*, 462 U.S. 1039, 1043-44, 103 S. Ct. 2830, 2833-34 (1983).  For example, in *State v. Smith*, 193 Ariz. 452, 459, ¶ 31, 974 P.2d 431, 438 ¶ 31 (1999), we held that although the defendant initially requested counsel, he waived his right to counsel when he reinitiated contact with the police by stating, "I don't see why I shouldn't just tell you."

¶15     The Pima County Sheriff's Department conducted two video-taped interviews with Finch after his arrest.  Finch was given *Miranda* warnings prior to the first interview, and the following exchange ensued:

    Officer:  Do you understand what I've told you?
    Finch:    Yes, I do.
    Officer:  Okay . . . having been told these . . . will
              you talk to uh . . . to us about what
              happened?
    Finch:    I'm not gonna, not gonna play around.  Uh . .
              . I would like to have counsel (five second
              pause).  You can ask questions, though.
    Officer:  Okay.  Um we'll keep that in mind.  And so you
              know . . . um . . . we appreciate you
              answering questions.  Um . . . and of course
              you will be afforded counsel . . . um . . . as
              soon as . . . um . . . I don't know if you've
              ever been arrested before?
    Finch:    Yes, I have.
    Officer:  So you know the . . . the routine there, and
              you will be afforded . . . uh counsel.  *But
              will you talk to us now*?
    Finch:    *I'll talk to you now*.

7

Finch then proceeded to describe all three robberies and confess to his role in them.

¶16 Finch's statement, "You can ask questions, though," superseded his request for counsel. Finch's interviewer clarified that Finch's statement demonstrated an intent to speak with detectives by asking, "But will you talk to us now?" Finch clearly replied, "I'll talk to you now." Thus, Finch reinitiated contact with police after his request for counsel.

¶17 Following a suppression hearing at which the trial judge viewed Finch's video-taped confession and heard testimony from the two detectives who interviewed Finch, the judge admitted Finch's confession. We find no error.

**B.**

¶18 Finch claims that the trial court's reasonable doubt instruction improperly shifted the burden of proof to the defendant. In its instruction, the trial court defined reasonable doubt as "proof that leaves you firmly convinced of the defendant's guilt." The court also explained:

> If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crimes charged, you must find him or her guilty. If, on the other hand, you think that there is a real possibility that the defendant is not guilty, you must give the defendant the benefit of the doubt and find the defendant not guilty.

The trial court gave the reasonable doubt instruction approved in *State v. Portillo*, 182 Ariz. 592, 898 P.2d 970 (1995), and upheld

8

in *State v. Van Adams*, 194 Ariz. 408, 418 ¶ 30, 984 P.2d 16, 26 ¶ 30 (1999).  The trial court did not err.

**C.**

**¶19**      Finch argues that he joined co-defendant Phillips' request for a jury instruction on proximate cause and that the trial court erred in refusing to give the instruction.  Finch, however, neither requested a proximate cause instruction nor joined in Phillips' request for one.  If a party fails to object to an error or omission in a jury instruction, we review only for fundamental error.   Rule 21.3(c), Arizona Rules of Criminal Procedure (Ariz. R. Crim. P.); *State v. Valenzuela*, 194 Ariz. 404, 405 ¶ 2, 984 P.2d 12, 13 ¶ 2 (1999).

**¶20**      A trial court does not commit fundamental error by failing to *sua sponte* give a proximate cause instruction in a felony murder case when causation is not at issue in the trial. *State v. Smith*, 160 Ariz. 507, 510, 774 P.2d 811, 814 (1989). Finch argues that because the police did not find Hendricks in time to save his life, the time it took police to locate Hendricks constituted a superseding event that proximately caused Hendricks' death.  Finch confessed, however, that he shot Hendricks in the back twice from a distance of eight to twelve feet.  Hendricks died as a result of those two gunshot wounds.  Although Hendricks may have survived had he received prompt medical attention, he would not have died had Finch not shot him in the back.  Thus, causation

was not at issue, and the trial court did not commit fundamental error by not *sua sponte* providing a proximate cause instruction to the jury.

## D.

¶21        Finch argues the court erred by instructing the jury that intoxication, by alcohol or drugs, is no defense to any criminal act, and cannot be considered with respect to any criminal state of mind.  We have previously rejected this argument because A.R.S. section 13-503 "expressly states that voluntary, temporary intoxication is not a defense to any crime *or culpable mental state*."  *State v. Sharp*, 193 Ariz. 414, 423 ¶ 30, 973 P.2d 1171, 1180 ¶ 30 (1999) (emphasis added).

## E.

¶22        Finch contends that the trial court improperly excluded or the State struck seven jurors on the basis of their religious views.  Three of the seven jurors listed by Finch belonged to Phillips' jury.  The trial court excluded or the State struck three of the four jurors in Phillips' panel for non-religious reasons.  Specifically, the court excused Mr. H due to severe financial hardship and excused Ms. F because she did not understand English well enough to serve on a jury.  The State struck Ms. L because she had difficulty understanding English and did not want to serve on the jury.  Thus, Finch's argument is limited to Ms. R, whom the State struck.

10

¶23     Jurors may be struck for nondiscriminatory reasons. *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986). In response to the trial court's question as to whether potential jurors' views on the death penalty would affect their ability to serve, Ms. R stated she did not believe in the death penalty and her views on the death penalty would make it difficult for her to decide a case if the death penalty might be imposed. Ms. R, however, never stated that her views were religiously motivated. After further questioning by the trial court, she stated that she would be able to serve on the jury. Because Finch did not provide any evidence to support his contention that the State struck Ms. R for religious reasons, the trial court did not err in allowing the State to use a peremptory challenge.

¶24     Finch also argues that the court or State removed Mr. H, Ms. F, Ms. L, and Ms. R for religious reasons because they stated their religious views in questionnaires. Although the record confirms that these jurors described their religious viewpoints in jury questionnaires, Finch has not shown these statements led to their removal. Even if the court or State removed jurors because their religious convictions affected their ability to serve, it is not improper to "question and excuse venire members who would not be impartial for any reason, religious or otherwise." *State v. Fisher*, 141 Ariz. 227, 249, 686 P.2d 750, 772 (1984). Thus, we find no error.

11

¶25      Finch argues that the State did not prove his felony murder conviction beyond a reasonable doubt because the trial court's special verdict stated that Finch engaged in an act of gratuitous murder, and Arizona's felony murder statute does not include gratuitous murder.

¶26      In describing Hendricks' death as an act of gratuitous murder, the trial court observed that Finch did not need to shoot Hendricks to complete the robbery.  The court also found that Finch shot Hendricks to avoid apprehension in order to spend his ill-gotten gains.

¶27      Felony murder requires that the defendant commit murder "in furtherance of" the underlying felony.  A.R.S. § 13-1105.A.2. At trial, Finch testified that he shot Hendricks to prevent him from telling anyone that a robbery was taking place.  Finch's admission allowed a jury to conclude that Finch shot and killed Hendricks in order to successfully complete the robbery.  Thus, sufficient evidence justified the jury verdict convicting Finch of felony murder.

### III.

### A.

¶28      Finch contends the trial court erred when it referred to an undisclosed Army Field Manual in its special verdict.  The trial

12

court did not, however, rely on the manual in deciding to impose the death sentence. Rather, the court merely prefaced its findings with excerpts from the manual. Additionally, the court did not use the manual to make its findings with respect to aggravation and mitigation. We find no error.

**B.**

¶29 Finch challenges the court's findings related to aggravating factors. First, Finch claims the trial court erred in finding that he committed Hendricks' murder for pecuniary gain. We disagree.

¶30 When a defendant commits murder "as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value," the court shall consider this an aggravating circumstance. A.R.S. § 13-703.F.5 (2000). The State must establish F.5 by proving beyond a reasonable doubt that financial gain "was a motive, cause, or impetus for the murder and not merely the result of the murder." *State v. Sansing*, 200 Ariz. 347, 353 ¶ 12, 26 P.3d 1118, 1124 ¶ 12 (2001) (citations omitted). Although "[t]he existence of an economic motive at some point during the events surrounding a murder is not enough to establish pecuniary gain," we have held that "a murder committed to facilitate escape and/or hinder detection by police furthers the pecuniary interest of the criminal." *Id*. at 354 ¶ 14, 355 ¶ 21, 26 P.3d at 1125 ¶ 14, 1126 ¶ 21 (citations omitted).

13

¶31　　In this case, Finch himself testified that he shot Hendricks to prevent him from telling anyone that a robbery was taking place. Thus, Finch murdered Hendricks so that he and Phillips could complete the robbery without being detected. Because the motive behind Hendricks' murder facilitated Finch and Phillips' escape as well as "the taking of or the ability to keep items of pecuniary value," the trial court properly found the pecuniary gain factor. *Id*. at 354 ¶ 15, 26 P.3d at 1125 ¶ 15.

¶32　　Finch also contests the trial court's application of the F.2 aggravating factor by arguing that conviction for a previous serious offense that is "simultaneous" with the murder conviction should be afforded less weight than a "historical" conviction. Here, the trial court based its F.2 finding on Finch's convictions, entered prior to sentencing, for armed robbery, kidnaping, and aggravated assault from the first and second robberies.

¶33　　When a "defendant was previously convicted of a serious offense, whether preparatory or completed," the trial court shall consider this an aggravating circumstance. A.R.S. § 13-703.F.2. (2000). Convictions entered simultaneously with the murder conviction but prior to sentencing satisfy F.2. *State v. Jones*, 197 Ariz. 290, 311 ¶ 64, 4 P.3d 345, 366 ¶ 64 (2000). Because Finch's convictions stemming from the first and second robberies were entered prior to sentencing, they qualify as previous serious offenses under F.2. Thus, the trial court did not err.

14

### C.

¶34      Finch asserts that the trial court either failed to consider or failed to give adequate weight to a number of mitigating factors. We disagree.

### 1.

¶35      Finch argues the trial court erred in rejecting his use of crack cocaine during the robberies as a mitigating factor because cocaine significantly impaired his ability to appreciate the wrongfulness of his actions or to conform his conduct to the requirements of the law.

¶36      A statutory mitigating factor exists when "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13-703.G.1 (2000).[2] Finch did not prove that cocaine impaired him or even that he used cocaine when he committed the robberies and Hendricks' murder. In fact, testimony from an old family friend and Finch's mother provided the only evidence of Finch's drug use. The family friend merely stated that Finch, along with his father and brother, had used drugs three or four years earlier. Mrs. Finch testified that Finch, his

---

    [2]     A.R.S. section 13-703.G.1 is now found at section 13-703.H.1.

15

brother and his father had recently used crack cocaine.  In contrast, Finch's video-taped confession, taken two hours after his arrest, shows that Finch clearly and coherently answered questions regarding all three robberies.  The trial court did not err in finding that Finch failed to prove the G.1. mitigator by a preponderance of the evidence.

2.

¶37     Finch proffered his family's support as a non-statutory mitigating factor.  The trial court did not err in finding that although Finch proved his family loves and supports him, this mitigator did not warrant leniency.  *See State v. Rienhardt*, 190 Ariz. 579, 592, 951 P.2d 454, 467 (1997) (the fact the defendant's family appeared to care about his future and that he had a young son did not overcome the aggravators).

3.

¶38     Finch contests the trial court's refusal to find that the effects of Finch's execution on his children is a non-statutory mitigator.

¶39     In *State v. Greene*, 192 Ariz. 431, 443 ¶ 58, 967 P.2d 106, 118 ¶ 58 (1998), the defendant's ex-wife's testimony expressed concern about the effect the defendant's execution would have on their children.  We concluded the trial court should have given "some mitigating weight to the effect Greene's execution would have on the emotional well-being of his children." *Id*.  Here, Finch's

16

ex-wife did not testify as to the effects of Finch's execution on his two children. Furthermore, although Finch's mother offered testimony that Finch's children visit him in prison, Finch's children did not live with him prior to the robberies and testimony suggested that Finch maintained only minimal contact with his children before his arrest. Thus, we concur with the sentencing judge's findings. *See State v. West*, 176 Ariz. 432, 451, 862 P.2d 192, 211 (1993) (refusing to find mitigation where defendant maintained only minimal contact with his child).

4.

**¶40** The trial court found that Finch's remorse, although proven, did not call for leniency. Finch argues that the trial court should have given more weight to his remorse. We uphold the trial court's finding because Finch's remorse did not stop him from committing the second and third robberies and does not counterbalance his willingness to hurt or kill innocent people for financial gain. *See State v. Spreitz*, 190 Ariz. 129, 150, 945 P.2d 1260, 1281 (1997).

5.

**¶41** We have previously rejected personal growth and pretrial and presentence good behavior during incarceration as a mitigating circumstance because "a defendant [is] expected to behave himself in [jail] while awaiting [sentencing]." *Id.*

6.

17

¶42     Finch claims that he was under emotional duress when he committed the robberies because he needed money to buy drugs. Duress is "any illegal imprisonment, . . . threats of bodily or other harm, or other means amounting to or tending to coerce the will of another, and actually inducing him to do an act contrary to his free will." *State v. Wallace*, 151 Ariz. 362, 369, 728 P.2d 232, 239 (1986). Finch did not provide any evidence suggesting he was under duress when he committed the robberies and killed Kevin Hendricks. We affirm the trial court's finding that duress did not constitute a mitigating factor in Finch's case.

7.

¶43     The trial court found that Finch's difficult childhood did not call for leniency because while Finch's father was a functioning substance abuser, Finch's conduct went far beyond that provided by his father's example. We have held that "family background may be a substantial mitigating circumstance when it is shown to have some connection with the defendant's offense-related conduct." *Greene*, 192 Ariz. at 442 ¶ 51, 967 P.2d at 117 ¶ 51. Because Finch did not establish a nexus between his father's substance abuse and his actions, the trial court did not err.

8.

¶44     The trial court found that Finch did not prove any impairment due to drugs and alcohol. As stated above, Finch's video-taped confession reveals no sign that he was impaired when he

18

committed the robbery and killed Kevin Hendricks. We find no error.

9.

¶45    Finch asserts that his felony murder conviction evinces that he lacked the intent to kill Kevin Hendricks. Although a felony murder conviction can be a mitigating factor, any mitigation will be offset by a defendant's "major participation in the planning and execution of the crime." *State v. Dickens*, 187 Ariz. 1, 25, 926 P.2d 468, 492 (1996). Finch substantially participated in the planning and execution of the three robberies and the murder of Kevin Hendricks. Thus, Finch's felony murder conviction does not provide mitigation in this case.

## IV.

¶46    The trial court correctly found the F.5 and F.2 aggravating factors. The proven mitigation involves the support Finch receives from his family, Finch's remorse, rehabilitative potential, good behavior, and cooperation with authorities. Independently considering those factors, we conclude that the mitigation, individually and collectively, does not outweigh the aggravation.

## V.

¶47    We have previously considered and rejected the following challenges Finch makes to the constitutionality of Arizona's death sentencing scheme:

19

¶48    Finch claims his sentence is unconstitutional because the pecuniary gain aggravating factor does not narrow the class of persons eligible for the death penalty.  We disagree.  *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

¶49    Finch argues that Arizona's capital sentencing scheme is unconstitutional in light of *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215 (1999), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), because judges, not juries, sentence defendants in capital cases in Arizona.  Because neither *Jones* nor *Apprendi* expressly overrules *Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047 (1990), which upheld Arizona's capital sentencing scheme, this court remains bound by *Walton*.  *State v. Ring*, 200 Ariz. 267, 279-80 ¶ 44, 25 P.3d 1139, 1151-52 ¶ 44 (2001), *cert. granted*, 122 S. Ct. 865, 151 L. Ed. 2d 738 (Jan. 11, 2002).

## VI.

¶50    We reject the following arguments, raised by the defendant to preserve for appeal:

The prosecutor's discretion to seek the death penalty is unconstitutional and violates the Eighth and the Fourteenth Amendments of the United States Constitution and Article II, Sections 1, 4 and 15 of the Arizona Constitution.  *See State v. Rossi*, 146 Ariz. 359, 366, 706 P.2d 371, 378 (1985).

¶51    The Arizona death penalty statute is applied in a manner that discriminates against poor, young, and male defendants in

20

violation of the Thirteenth Amendment of the Constitution and Article II, Sections 1, 4, and 13 of the Arizona Constitution. *See State v. Stokley*, 182 Ariz. 505, 516, 898 P.2d 454, 465 (1995).

¶52 Arizona's death penalty statute is cruel and unusual punishment and violates the Eighth and Fourteenth Amendments of the Constitution and Article II, Section 15 of the Arizona Constitution. *See State v. Gulbrandson*, 184 Ariz. 46, 72-73, 906 P.2d 579, 605-06 (1995).

¶53 Arizona's death penalty statute is imposed arbitrarily and irrationally in violation of the Eighth Amendment of the Constitution and Article II, Sections 1 and 15 of the Arizona Constitution. *See State v. Roscoe*, 184 Ariz. 484, 501, 910 P.2d 635, 652 (1996).

¶54 Arizona's death penalty statute does not provide guidance to the sentencing court because no objective standards exist. The statute which assists in weighing the aggravating and the mitigating circumstances violates the Eighth and Fourteenth Amendments of the Constitution and Article II, Section 15 of the Arizona Constitution. *See id.; State v. Bolton*, 182 Ariz. 290, 310, 896 P.2d 830, 850 (1995).

¶55 The failure of the Arizona courts to conduct a proportionality review denied defendant due process of law. *See State v. Salazar*, 173 Ariz. 399, 416-17, 844 P.2d 566, 583-84 (1992).

21

¶56    The jury selection process in Arizona allows for a conviction-prone jury in violation of the right to a fair and impartial jury under the Sixth and Fourteenth Amendments of the Constitution and Article II, Sections 4, 23, and 24 of the Arizona Constitution. *See Jones*, 197 Ariz. at 302 ¶ 24, 4 P.3d at 357 ¶ 24.

¶57    The death penalty in Arizona is unconstitutional because a defendant cannot death-qualify the sentencer. This violates a defendant's rights under the Eighth and Fourteenth Amendments of the Constitution and Article II, Section 15 of the Arizona Constitution. *See State v. Rossi*, 154 Ariz. 245, 247-48, 741 P.2d 1223, 1225-26 (1987).

¶58    Denying defendant the right to a jury trial in the sentencing phase violated his Eighth and Fourteenth Amendment rights under the Constitution and Article II, Sections 13 and 15 of the Arizona Constitution. *See generally Walton*, 497 U.S. 639, 110 S. Ct. 3047 (1990); *State v. Hoskins*, 199 Ariz. 127, 146 ¶ 84, 14 P.3d 997, 1016 ¶ 84.

## VII.

¶59    For the foregoing reasons, we affirm the defendant's convictions and sentences.

_____
Ruth V. McGregor, Vice Chief Justice

22

CONCURRING:

_____
Charles E. Jones, Chief Justice

_____
Stanley G. Feldman, Justice

_____
Thomas A. Zlaket, Justice (Retired)

_____
Edward C. Voss, Judge*


*Pursuant to Ariz. Const. Article VI, Section 3, the Honorable
Edward C. Voss, Chief Judge of the Court of Appeals, Division One,
was designated to sit on this case.