SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-01-0270-AP |
| Appellee, | ) | |
| | ) | |
| v | ) | Maricopa County Superior |
| | ) | Court |
| CHRISTOPHER GEORGE THEODORE | ) | No. CR1996-011714 |
| LAMAR, | ) | |
| | ) | |
| Appellant. | ) | **O P I N I O N** |
| | ) | |
| _____ | ) | |

Appeal from the Superior Court of Maricopa County
No. CR1996-011714
The Honorable Stephen A. Gerst, Judge

**CONVICTIONS AFFIRMED**

_____

Janet Napolitano, Former Arizona Attorney General      Phoenix
Terry Goddard, Arizona Attorney General
    by     Kent E. Cattani, Chief Counsel Capital
          Litigation Section
    and    Robert L. Ellman, Assistant Attorney General
Attorneys for the State of Arizona

Susan M. Sherwin, Maricopa County           Phoenix
Office of the Legal Advocate
    by     Brent E. Graham
Attorneys for Christopher George Theodore Lamar

_____

M c G r e g o r, Vice Chief Justice

¶1      A jury convicted Christopher George Theodore Lamar of the first degree murder and kidnapping of Ronald Jones.  Following a sentencing hearing, the trial judge sentenced Lamar to death for the first degree murder conviction and to twenty-one years

imprisonment for the kidnapping conviction.  Appeal to this court is automatic and direct for capital cases.  Ariz. Rev. Stat. (A.R.S.) § 13-703.04 (Supp. 2002); Ariz. R. Crim. P. 31.2.b.  We exercise jurisdiction pursuant to Article VI, Section 5.3 of the Arizona Constitution and A.R.S. section 13-4031 (2001).

## I.

¶2      This court views the evidence in the light most favorable to sustaining the verdict.  *State v. Moore*, 111 Ariz. 496, 497, 533 P.2d 663, 664 (1975).

¶3      In April 1996, Lamar met and became involved with Myla Hogan.  While the two were dating, Hogan lived in a house on 81st Avenue in Peoria, Arizona, with several other people, including Mary Keovorabouth, Ouday "Tim" Panmany, Vincent Macchirella, Richard Valdez, and Abraham Hermosillo.[1]

¶4      On May 11, 1996, Ronald Jones left his house around 1:00 p.m., telling Alicia Sosa, his live-in girlfriend, that he planned to deliver documents to a loan company.  At some point, Hogan called Jones's pager to invite him to lunch.  Hogan and Jones knew one another through Keovorabouth.  Jones picked Hogan up at the house on 81st Avenue, and the two ate lunch together.

---

[1]      Vincent Macchirella and Abraham Hermosillo accepted plea agreements in exchange for their testimony in any trial related to the murder and kidnapping of Ronald Jones.  Macchirella pled guilty to second degree murder and received a thirteen-year sentence. Hermosillo pled guilty to second degree murder and received a ten-year sentence.

¶5    When Hogan and Jones returned to the house on 81st Avenue, Keovorabouth, Hermosillo, Macchirella, Valdez, Panmany, and Lamar were all present. Prior to May 11, the group had devised a plan to kidnap and rob Jones. The purpose of the plan was twofold: to steal Jones's money and possessions so they could pay rent and to "rough him up a little bit" so he would stop spending time with Hogan.

¶6    Lamar and the others were waiting for Jones when Hogan and Jones returned to the house. When Lamar confronted Jones about his relationship with Hogan, Jones responded that he did not know of Hogan's involvement with Lamar. Lamar then punched Jones. After Jones fell to the floor, Macchirella pointed a gun at him. At Lamar's direction, Hermosillo retrieved duct tape and bound Jones's hands and ankles.

¶7    Lamar and Macchirella then moved Jones into a bedroom and took his possessions, including his shoes, jewelry, fifty dollars, and some crack cocaine. Jones cried and pleaded for his life, offering to write a check if they released him. Lamar demanded the gun from Macchirella, explaining that he had "done this before." The group then led Jones upstairs and held him captive while everyone watched television and took turns guarding Jones with the gun. Jones begged to be let go several times.

¶8    When it became dark, Lamar and the others led Jones downstairs and forced him into the front passenger seat of Jones's

3

car.  Lamar directed Macchirella to drive to Lamar's and Hermosillo's old neighborhood near 35th Avenue and Broadway Road. Hermosillo, Panmany, and Valdez followed in a stolen truck but made a stop along the way.  Lamar sat behind Jones in the car.  At one point, Lamar held the gun to Jones's head and pulled the trigger, but the gun did not fire.  Jones cried and pleaded for his life when he heard the click of the gun.

¶9      Eventually, Lamar directed Macchirella to stop the car. Macchirella pulled the car to the side of the road near a vacant lot.  The three men exited the vehicle and walked to the back of the car.  At Lamar's direction, Macchirella opened the trunk. Lamar then shot Jones.  At trial, the medical examiner testified that Jones suffered two gunshot wounds to the head.  Macchirella testified that as he and Lamar picked Jones up and placed him in the trunk, Jones made "gurgling" sounds, as if he were choking on his own blood.

¶10     Hermosillo, Panmany, and Valdez were at Hermosillo's grandmother's nearby house when they heard gunshots.  When they arrived at the scene and asked what had happened, Lamar responded by opening the trunk and patting Jones's back.

¶11     The group decided to move Jones's car and bury his body. The car would not start, so they pushed it to a parking lot. Someone retrieved a shovel, and, at Lamar's direction, Macchirella dug a grave.  Lamar, Hermosillo, Panmany, and Valdez then dragged

Jones's body to the grave, pushed him into the hole, and covered it with dirt and brush. Some or all of the group removed a cellular telephone, a radio, a CD player, a toolbox, and a tool belt from Jones's car. They then set Jones's car on fire.

¶12 At some time during the night, Macchirella called the house in Peoria from Jones's cellular telephone, telling Keovorabouth they had made a mistake. Lamar chastised him for using the phone, which could connect them to Jones.

¶13 Everyone then went to a party in Lamar's and Hermosillo's old neighborhood. At the party, Lamar saw his cousin Frances Lamar. Frances later testified that she noticed some blood on Lamar's shoes. Lamar asked Frances for a ride to Mesa, and while they were driving she saw him throw a shoe out the window. Lamar returned to the party and he, Macchirella, Hermosillo, Panmany, and Valdez drove back to Peoria in the stolen truck. They abandoned the truck in a nearby parking lot and walked back to the house on 81st Avenue.

¶14 Hogan testified that after the group returned to the house she asked Lamar where they had been and he responded, "Don't ask." Hogan described Lamar as looking very white, as if he had seen a ghost.

¶15 According to Hermosillo, when they returned to the house, both Lamar and Macchirella accused the other of shooting Jones, but both eventually claimed to have shot Jones. Hermosillo testified

5

that Lamar also described the size of the holes that the bullets made in Jones's head.

¶16      In September 1996, Silent Witness received a tip, apparently from Lamar's cousin Frances, that the police could find a body buried in a vacant lot near 43rd Avenue and Weir.  Later, Hogan, Frances, and Frances's sister Marie spoke with Maricopa County Sheriff Detective John Strang.  After interviewing the women, the police searched a gravel pit near 43rd Avenue and Weir and located a body, later identified through dental x-rays as Ronald Jones.

¶17      The police then executed a search warrant at the apartment of Debra Lamar, Lamar's aunt, where Lamar and Hogan sometimes stayed.  In a trash dumpster behind the apartment, the police discovered a tool belt, wrapped in a diaper. Debra admitted that she found the tool belt in the pantry, where Lamar kept his belongings, and that she threw the belt into the dumpster.  The police also found a toolbox on a shelf located in the rear of the kitchen.

¶18      The police did not test the toolbox or the tools found in it for fingerprints.  Alicia Sosa testified, however, that she recognized some of the tools as belonging to Jones.  Sosa also identified handwriting on a note found in the toolbox as her own.

¶19      In February 1997, a grand jury indicted Lamar for the first degree murder and kidnapping of Ronald Jones.  The court

6

appointed Mr. Steinle and Mr. Dupont from the Office of the Legal Defender to represent Lamar. In May 1999, Lamar moved to discharge Mr. Steinle but consented to his continued representation by Mr. Dupont. At that time, Mr. Steinle and Mr. Dupont told the trial judge that Lamar's case was prepared for trial, and that they had provided Lamar the materials related to his case. The trial court granted Lamar's request and dismissed Mr. Steinle. In October 1999, Lamar moved to represent himself but withdrew his motion when the trial judge denied his request for a continuance.

¶20 On December 10, 1999, a jury convicted Lamar of kidnapping and first degree murder on both premeditated and felony murder theories. After considering the aggravating and mitigating circumstances, the trial court sentenced Lamar to death.

## II.

¶21 Lamar argues that the trial court abused its discretion in denying his motion to continue and that the denial effectively prevented him from representing himself, thereby violating rights secured by the Sixth Amendment and Article II, Section 24 of the Arizona Constitution.[2] The State contends the court acted within its discretion and did not infringe upon Lamar's Sixth Amendment

---

[2] Lamar does not assert that Article II, Section 24 of the Arizona Constitution provides a broader right to self-representation than does the Sixth Amendment. Nor does Lamar separately analyze his argument under the Arizona Constitution. We therefore analyze his argument in accordance with Sixth Amendment jurisprudence. *See State v. Nunez*, 167 Ariz. 272, 274 n.2, 806 P.2d 861, 863 n.2 (1991).

7

right because it did not deny Lamar's motion to represent himself.[3]

## A.

¶22     The right to counsel under both the United States and Arizona Constitutions includes an accused's right to proceed without counsel and represent himself.  *Faretta v. California*, 422 U.S. 806, 836, 95 S. Ct. 2525, 2541 (1975); *State v. De Nistor*, 143 Ariz. 407, 412, 694 P.2d 237, 242 (1985).  To exercise this right, a defendant must voluntarily and knowingly waive his right to counsel and make an unequivocal and timely request to proceed pro se.  *De Nistor*, 143 Ariz. at 412, 694 P.2d at 242.  Generally, a request is considered timely if it is made "before meaningful trial proceedings have commenced,"[4] which courts have interpreted to mean before the jury is empaneled.  *Armant v. Marquez*, 772 F.2d 552, 555 (9th Cir. 1985); *De Nistor*, 143 Ariz. at 412, 694 P.2d at 242.  If a defendant complies with these requirements, the trial court

---

[3]     The State also argues that Lamar did not actually move to continue the trial date, noting that he failed to file a written motion in compliance with Rule 8.5 of the Arizona Rules of Criminal Procedure.  We reject this assertion.  First, both the State and defense counsel previously made oral requests for continuances, which the trial court granted.  Although it is preferable that a party file a written motion for continuance, given the trial court's previous rulings, we do not find that Lamar failed to request a continuance simply because he did not file a written motion.  Moreover, the record indicates that the trial court treated arguments on October 25 and 26, 1999, regarding whether Lamar desired to represent himself, as involving a motion to continue.

[4]     *Chapman v. United States*, 553 F.2d 886, 895 (5th Cir. 1977).

should grant the defendant's request to represent himself. *Armant*, 772 F.2d at 555.

¶23     Lamar first expressed his desire to represent himself on October 21, 1999, when he filed a motion for change of counsel by requesting that the Office of the Legal Defender be withdrawn and that he be substituted as replacement counsel. Lamar asked for an extension of the trial date until at least January to prepare his defense. Because the trial, scheduled to begin on November 18, 1999, had not yet commenced, Lamar's request was timely.

¶24     At a hearing on the motion on October 25, the court stated it would consider the request on the following day. At that hearing, the trial judge asked Lamar a series of questions to ensure that Lamar was voluntarily and knowingly relinquishing his right to counsel. Lamar unequivocally asserted his right to represent himself and signed a waiver of counsel form. The record clearly shows that the trial court intended to grant Lamar's request for self-representation. When the trial judge explained that he did not intend to continue the trial and asked whether, given that knowledge, Lamar still wished to represent himself, Lamar responded, "No." He thus effectively withdrew his request.

**B.**

¶25     Lamar argues that the trial court abused its discretion in denying his request for a continuance because the denial resulted in a de facto denial of his constitutional right to self-

9

representation.  We disagree.

¶26     Although a defendant enjoys a constitutional right to represent himself, *Faretta*, 422 U.S. at 836, 95 S. Ct. at 2541, the Constitution does not also require that a trial court grant a defendant a continuance regardless of the circumstances.  A trial court maintains discretion in determining whether to grant a continuance made in conjunction with a motion to proceed pro se. *See Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S. Ct. 841, 849 (1964) (reviewing a denial of a continuance that the defendant claimed deprived him of his right to counsel for an abuse of discretion); *Sampley v. Attorney Gen.*, 786 F.2d 610, 613 (4th Cir. 1986) ("[T]rial courts must be accorded wide discretion in deciding whether to grant continuances, notwithstanding that constitutional rights may be implicated."); *State v. LeVar*, 98 Ariz. 217, 220-21, 403 P.2d 532, 535 (1965) (explaining that although the right to counsel includes the right to adequate time to prepare, a trial court maintains discretion in determining whether to grant a continuance).

¶27     A trial court maintains discretion because a defendant's right to represent himself does not exist in a vacuum.  *De Nistor*, 143 Ariz. at 412, 694 P.2d at 242.  The court must consider the defendant's right in conjunction with a victim's constitutional

right to a speedy trial[5] and the trial court's prerogative to control its own docket. Scheduling a trial presents the practical challenge of "assembling the witnesses, lawyers, and jurors at the same place at the same time." *Morris v. Slappy*, 461 U.S. 1, 11, 103 S. Ct. 1610, 1616 (1983). Consequently, when a defendant asserts his right to self-representation and the trial court is prepared to grant the defendant's motion to proceed pro se but not his request for a continuance, "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates" the defendant's constitutional right to self-representation. *Id*. at 11-12, 103 S. Ct. at 1616 (quoting *Ungar*, 376 U.S. at 589, 84 S. Ct. at 849).

¶28    Whether denying a continuance violates a defendant's constitutional rights depends on the facts and circumstances of a particular case. *State v. Hein*, 138 Ariz. 360, 369, 674 P.2d 1358, 1367 (1983). We therefore view the trial court's denial of a continuance in the context of a case's history.

¶29    In *De Nistor,* which involved facts similar to those in this case, we discussed the factors a court should consider in deciding a motion to continue made in conjunction with a request for self-representation. There, after the jury had been empaneled

_____

[5]    The Arizona Constitution protects a victim's right "[t]o a speedy trial or disposition and prompt and final conclusion of the case after the conviction and sentence." Ariz. Const. art. II, § 2.1(A)10.

and several witnesses had testified, the defendant asked to discharge her attorney so that she could represent herself. 143 Ariz. at 412, 694 P.2d at 242. The defendant also requested a continuance to prepare her defense. *Id*. The trial court stated it would permit the defendant to proceed pro se but that it would not grant a continuance. *Id*. We upheld the trial court's decision and explained that a trial court, in evaluating a request for continuance, coupled with a request for self-representation, should consider factors such as "the reasons for the defendant's request, the quality of counsel, the defendant's proclivity to substitute counsel and the disruption and delay expected in the proceedings if the request were to be granted." *Id*. at 413, 694 P.2d at 243. Three of the four *De Nistor* factors are relevant in evaluating Lamar's case: the reasons for the continuance, Lamar's proclivity to substitute counsel, and the expected disruption if the trial court granted the continuance.[6] We conclude the trial court did not abuse its discretion in denying Lamar's motion to continue.

¶30 Although Lamar discharged one of his attorneys in May

---

[6] The *De Nistor* facts differ from Lamar's facts in one significant aspect: De Nistor did not timely assert her right to self-representation whereas Lamar did. Although a court should grant a timely, unequivocal motion to proceed pro se, the court maintains discretion in deciding whether to grant an untimely motion for self-representation. If a defendant makes a timely request, therefore, the quality of counsel should have little impact on the trial court's decision. If the trial court exercises its discretion over an untimely request, the quality of counsel factor could more directly affect the court's decision.

12

1999, he had not demonstrated a proclivity for substituting counsel. That factor supports granting a continuance. The other factors, however, weigh against granting the request.

¶31      The explanation a defendant provides to the trial court to justify a request for a continuance constitutes a critical factor in determining whether the trial court abused its discretion in denying the request. *See Ungar*, 376 U.S. at 589, 84 S. Ct. at 850; *United States v. Garmany*, 762 F.2d 929, 936 (11th Cir. 1985); *United States v. Uptain*, 531 F.2d 1281, 1285-86 (5th Cir. 1976). Without knowing the reasons justifying a continuance, we are left to speculate whether the trial court acted arbitrarily in balancing the defendant's needs against the victim's rights and the orderly administration of justice.

¶32      At trial, and now on appeal, Lamar has failed to articulate any specific reasons that necessitated a continuance. He points to nothing in the record, and we have found nothing on review, that explains what he would have done had the trial been continued that he could not have accomplished before the November trial date. Indeed, when Lamar first asserted his right to proceed pro se, he indicated that although he desired more time, he could be prepared for the November trial. Moreover, according to Lamar's counsel, his case had been ready for trial for almost five months. Although Lamar asserts that he had not received all the information he needed to prepare, he has not identified any materials to which

13

he lacked access. His lawyers' statements to the court further undermine his position; they told the trial judge that Lamar had received the evidence against him long before he requested the continuance.[7]  Lamar also indicated that he had received relevant material.  At the October 26 hearing, the judge asked Lamar whether he understood the complexity of his case and the risks of proceeding pro se.  Lamar responded:  "Yes, sir.  I've gone over my case many times, my police reports, and what I have."  Furthermore, if Lamar had represented himself, the court indicated it would appoint his lawyers, who were familiar with his case, as his advisory counsel.  Finally, the State's evidence implicating Lamar was not technical and consisted mostly of circumstantial evidence and the testimony of co-defendants Macchirella and Hermosillo.  Accordingly, the record provides no basis for this court to conclude that the time available to Lamar before trial was insufficient to allow Lamar to exercise his right to self-representation.

¶33	The trial court also had substantial reason to conclude that continuing the trial would have caused considerable disruption and delay.  By the time Lamar requested a continuance in

---

[7]	At the October 26, 1999 hearing, Lamar indicated he needed more time because he was "just barely getting some of the stuff from [his] case."  On May 24, 1999, however, Lamar's lawyers stated:  "We, for the record, categorically deny the fact that he has not been provided discovery or the opportunity to review the videotapes, audiotapes or anything else that he wanted."

14

conjunction with his motion to proceed pro se, the trial court had granted fifteen motions to continue. Coordinating the lawyers' busy schedules had presented a challenge: the court had granted continuances on five occasions due to schedule conflicts. Attempting to reschedule a trial that the court anticipated would last for three to four weeks undoubtedly would have caused further disruption and delay.

¶34 In addition, the court's decision could not have come as a surprise to Lamar. A grand jury indicted Lamar in February 1997. After setting a firm trial date for November 18, 1999, the trial court informed counsel and Lamar during a hearing in August 1999, that the court did not anticipate granting any more continuances. Given those circumstances, Lamar should have anticipated that any request for a continuance would be denied. Accordingly, applying the factors identified in *De Nistor*, we hold the trial court did not abuse its discretion in denying Lamar's continuance.

¶35 Lamar argues that, rather than rely on our decision in *De Nistor*, we should apply the standards articulated by the Ninth Circuit Court of Appeals in *Armant v. Marquez*, 772 F.2d 555 (9th Cir. 1985), for considering a motion to continue filed in conjunction with a request for self-representation. Although our conclusion rests upon the test this court adopted in *De Nistor*, we would reach the same result under *Armant*.

¶36 In *Armant*, the Ninth Circuit considered four factors to

determine whether a trial court abused its discretion in denying a motion to continue: (1) the degree of diligence by the defendant before the date beyond which a continuance is sought; (2) whether the continuance would have served a useful purpose if granted; (3) the inconvenience that granting the continuance would have caused the court or government; and (4) the amount of prejudice suffered by the defendant. *Armant*, 772 F.2d at 556-57.

¶37　　By waiting until October 21, 1999, to unequivocally assert his right to represent himself, Lamar exercised little diligence. His request came more than two and one-half years after he entered his not guilty plea. Although Lamar expressed dissatisfaction with one of his attorneys in May 1999, he did not at that time ask to represent himself. Instead, he consented to representation by Mr. Dupont and the Office of the Legal Defender. Second, as previously discussed, Lamar has not explained how the continuance would have been useful because he has not told us what he could have accomplished during the two-month extension that he could not accomplish before the November trial date. Third, unlike the situation in *Armant*, which involved a one-day trial, re-calendaring Lamar's case would have caused considerable inconvenience, for the reasons explained above. Finally, the record does not indicate the denial of the continuance prejudiced Lamar. Lamar had twenty-three days to prepare for trial with the assistance of advisory counsel familiar with his case. He has

16

failed to explain why he could not meaningfully exercise his right to self-representation without a continuance. Accordingly, we conclude the trial court did not abuse its discretion under the *Armant* standard.

### III.

¶38　Prior to trial, the trial court granted Lamar's motion in limine to preclude the State from introducing evidence that Richard Valdez, speaking in Lamar's presence, allegedly threatened Hogan by asking her if she would like to be buried next to her friend, referring to Ronald Jones. During the State's direct examination of Hogan, she testified about a time Macchirella threatened her when Lamar was not present. The State inquired whether anyone made threats in Lamar's presence. Hogan responded, "When Richard said they was [sic] going to bury me next to ---." Lamar's counsel immediately interrupted Hogan, objected on hearsay as well as foundational grounds, and later moved for a mistrial or dismissal.

¶39　Lamar raises three arguments related to this statement: (1) the trial court abused its discretion in denying his motion for a mistrial; (2) the prosecutor's conduct in eliciting the statement warranted a dismissal; and (3) Hogan's hearsay statement violated his constitutional right to confrontation. U.S. Const. amend. VI; Ariz. Const. art. II, § 24. We reject all three arguments.

### A.

¶40　We conclude that the trial court did not abuse its

17

discretion in denying Lamar's motion for a mistrial. "A declaration of mistrial is the most dramatic remedy for trial error and is appropriate only when justice will be thwarted if the current jury is allowed to consider the case." *State v. Nordstrom*, 200 Ariz. 229, 250 ¶ 68, 25 P.3d 717, 738 (2001). The trial court must consider two factors in determining whether to grant a motion for a mistrial based on a witness's testimony: (1) whether the testimony called to the jurors' attention matters that they would not be justified in considering in reaching their verdict and (2) the probability under the circumstances of the case that the testimony influenced the jurors. *State v. Bailey*, 160 Ariz. 277, 279, 772 P.2d 1130, 1132 (1989). This court gives great deference to a trial court's decision because the trial court "is in the best position to determine whether the evidence will actually affect the outcome of the trial." *State v. Jones*, 197 Ariz. 290, 304 ¶ 32, 4 P.3d 345, 359 (2000).

¶41    The trial court determined that Hogan's testimony that Valdez threatened her constituted hearsay. Therefore, arguably her testimony called the jurors' attention to a matter inappropriate for them to consider. The trial court did not abuse its discretion in denying the motion for a mistrial, however, because several factors make it highly improbable that Hogan's statement influenced the jury.

¶42    First, Lamar's counsel immediately objected, preventing

18

Hogan from completing the statement and mentioning that burying her next to her friend meant next to Jones. Second, even if Hogan had completed the statement, the statement does not necessarily implicate Lamar in the murder and kidnapping of Jones. By using the pronoun "they," Valdez could have been referring to several different people. Even if the jury inferred that Valdez included Lamar in his reference to "they," the inference does not prejudice Lamar unless the jury also believed Lamar adopted or joined in Valdez's threat. The extremely tenuous link between Hogan's incomplete statement and Lamar make any inference by the jury that Lamar adopted the statement highly improbable.

¶43 Furthermore, to avoid any prejudice to Lamar, the trial court instructed the jury to disregard Hogan's statement, explaining that there was no indication that Lamar heard the threat, acknowledged it, or was in anyway involved with Valdez's threat. The court's curative instruction sufficiently overcame any probability that the jury would conclude that Lamar had joined in the threat. *See State v. Ramirez*, 116 Ariz. 259, 265, 569 P.2d 201, 207 (1977) (concluding admission of victim's hearsay statement did not require reversal, in part, because the court instructed the jury to disregard the statement). Accordingly, the trial court did not abuse its discretion in denying Lamar's motion for a mistrial.

**B.**

¶44 Lamar next asserts that the prosecutor's conduct in

eliciting Hogan's statement warrants a dismissal. Specifically, he argues that the misconduct denied him a fair trial and violated his due process and double jeopardy rights, relying upon the Fifth and Fourteenth Amendments and Article II, Sections 4, 10, and 24 of the Arizona Constitution. Lamar also relies on *Pool v. Superior Court*, 139 Ariz. 98, 677 P.2d 261 (1984).

¶45 We reject Lamar's arguments and find his reliance on *Pool* misplaced. Lamar's characterization of the prosecutor's questioning of Hogan as misconduct conflicts with the trial court's finding that, although the prosecutor's question was "inartfully framed," the prosecutor did not intentionally evade the trial court's order. This finding of fact is not clearly erroneous. *See State v. Cuffle*, 171 Ariz. 49, 51, 828 P.2d 773, 775 (1992) ("Appellate review of a trial court's findings of fact is limited to a determination of whether those findings are clearly erroneous."). Importantly, a prosecutor's misconduct implicates a defendant's double jeopardy rights under *Pool* only when:

> 1. Mistrial is granted because of improper conduct or actions by the prosecutor; and
> 2. such conduct is not merely the result of legal error, negligence, mistake or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal; and
> 3. the conduct causes prejudice to the defendant which cannot be cured by means short of a mistrial.

*Pool*, 139 Ariz. at 108-09, 677 P.2d 271-72 (footnote omitted). Not only did the trial court find that the prosecutor's conduct was not

20

intentional, but, in addition, nothing in the record suggests that the prosecutor asked the question with an improper purpose or indifference to a significant resulting danger of mistrial or reversal. Lamar's argument that his double jeopardy rights were violated lacks merit.

## C.

¶46 Lamar finally asserts that Hogan's hearsay statement violated his constitutional right to confrontation. U.S. Const. amend. VI; Ariz. Const. art. II, § 24. Harmless error review applies to a confrontation violation. *Schneble v. Florida*, 405 U.S. 427, 430, 92 S. Ct. 1056, 1059 (1972); *State v. Corrales*, 138 Ariz. 583, 595, 676 P.2d 615, 627 (1983). Given that Hogan's statement did not necessarily implicate Lamar and that the judge gave a curative instruction, we can conclude beyond a reasonable doubt that the statement did not impact the jury's verdict. Thus, any confrontation violation was harmless error.

## IV.

¶47 Lamar presents several other arguments related to the guilt phase of his trial. We conclude that none has merit.

## A.

¶48 Lamar contends the trial court's instruction explaining the State's burden of proof beyond a reasonable doubt, which tracked the language we approved of in *State v. Portillo*, 182 Ariz.

592, 596, 898 P.2d 970, 974 (1995), is constitutionally deficient.[8] Specifically, Lamar asserts that the *Portillo* instruction, by using the phrase "firmly convinced," equates the beyond a reasonable doubt standard with a clear and convincing evidence standard, thereby lessening the State's burden. Lamar further argues that explaining to the jury that "[t]here are very few things in this world that we know with absolute certainty" reduces the State's burden as well. Finally, Lamar contends that the last sentence, which refers to a "real possibility" the defendant is not guilty, impermissibly shifts the burden to the defendant.

¶49 We have rejected the proposition that the *Portillo* instruction lessens the state's burden on several occasions. *State v. Hall*, __ Ariz. __, __ ¶ 56, 65 P.3d 90, 103 (2003); *State v. Prince*, __ Ariz. __, __ ¶ 25, 61 P.3d 450, 455 (2003); *State v. Cañez*, 202 Ariz. 133, 156 ¶ 76, 42 P.3d 564, 587 (2002); *State v. Van Adams*, 194 Ariz. 408, 418 ¶ 30, 984 P.2d 16, 26 (1999). We also have rejected the assertion that the *Portillo* instruction

---

[8] The judge instructed the jury as follows:

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime or crimes charged, you must find him guilty. If, on the other hand, you think there is a real possibility that he is not guilty of a crime or crimes charged, you must give him the benefit of the doubt and find him not guilty.

impermissibly shifts the burden to the defendant. *State v. Finch*, 202 Ariz. 410, 415 ¶ 18, 46 P.3d 421, 426 (2002). We again reject these challenges and reaffirm the constitutionality of the *Portillo* instruction. We find no error.

B.

¶50    Lamar contends that the prosecutor engaged in misconduct by vouching for the credibility of two of the State's witnesses by (1) commenting that a condition of both Macchirella's and Hermosillo's plea agreement required them to testify truthfully and (2) remarking upon the veracity of Macchirella's statement that he felt stupid when Lamar chastised him for using Jones's cellular telephone after the murder. Lamar did not raise either of these objections at trial. Thus, absent a finding of fundamental error, Lamar has waived the right to challenge the prosecutor's conduct on appeal. *State v. Gendron*, 168 Ariz. 153, 154, 812 P.2d 626, 627 (1991). To rise to the level of fundamental error, an "error must be clear, egregious, and curable only via a new trial." *Id*. at 155, 812 P.2d at 628.

¶51    A prosecutor impermissibly vouches for a witness by placing the prestige of the government behind its witnesses or suggesting that information not presented to the jury supports a witness's testimony. *State v. Dumaine*, 162 Ariz. 392, 401, 783 P.2d 1184, 1193 (1989). Lamar argues that the prosecutor placed the prestige of the government behind Macchirella's and

23

Hermosillo's testimony by highlighting that a condition of their plea agreements required them to testify truthfully.

¶52    We consistently have held that a prosecutor does not engage in misconduct merely by introducing evidence of a witness's agreement to testify truthfully in exchange for a plea agreement. *State v. James*, 141 Ariz. 141, 146, 685 P.2d 1293, 1298 (1984); *State v. McCall*, 139 Ariz. 147, 159, 677 P.2d 920, 932 (1983). Because Lamar cannot even establish misconduct, we reject his claim that the prosecutor's comments constitute fundamental error.

¶53    Additionally, Lamar argues that the prosecutor vouched for Macchirella by expressing his opinion regarding Macchirella's statement that he felt low when Lamar yelled at him for using Jones's cellular telephone. During closing arguments, the prosecutor stated:

> [B]oth witnesses said that when Macchirella used the phone [Lamar] told him that he was stupid, and Macchirella's statement to that was, it made me feel smaller than I already feel. *Well, that sounds like a truthful statement*, and it kind of just tells you what kind of a person that Macchirella is. He's not the leader type. He sort of has an inferiority complex.

(Emphasis added.)

¶54    A prosecutor must not convey his personal belief about the credibility of a witness. *See, e.g., State v. White*, 115 Ariz. 199, 204, 564 P.2d 888, 893 (1977). Although the prosecutor's italicized statement was inappropriate, its presence does not rise to the level of fundamental error. The comment does not say that

24

Macchirella is generally a credible person whose entire testimony should be accepted. Rather, when considered in context, the prosecutor's comment states only that Macchirella's description of his reaction to Lamar's belittling comments "sounds like a truthful statement." Moreover, the trial court instructed the jury that the lawyers' closing arguments were not evidence. Arizona courts have held that an instruction explaining to the jury that lawyers' arguments are not evidence has ameliorated instances of prosecutorial vouching more egregious than occurred here. *See State v. King*, 110 Ariz. 36, 43, 514 P.2d 1032, 1039 (1973) (holding prosecutor's expression of personal opinion as to defendant's guilt and at least two avowals as to a witness's credibility did not prejudice the defendant, in part, because court instructed jury that closing argument was not evidence); *State v. Taylor*, 109 Ariz. 267, 274, 508 P.2d 731, 738 (1973) (holding instruction that counsel's argument was not evidence corrected any prejudice due to prosecutor's opinion as to credibility of a state witness and defendant's guilt); *State v. Dillon*, 26 Ariz. App. 220, 223, 547 P.2d 491, 494 (1976) (acknowledging prosecutor's personal opinion regarding a witness's veracity improper but finding no prejudice because of instruction that closing argument was not evidence). Given both the limited context of the prosecutor's remarks and the court's instruction, we conclude the prosecutor's comment does not constitute fundamental error.

## V.

¶55       In *Ring v. Arizona*, 536 U.S. 584, ___, 122 S. Ct. 2428, 2443 (2002) (*Ring II*), the United States Supreme Court held unconstitutional that portion of A.R.S. section 13-703 (2001) that allowed judges to find facts that led to the aggravation of a defendant's sentence.   The Court declared that "[c]apital defendants, no less than non-capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."  *Id.* at ___, 122 S. Ct. at 2432.   The Court reversed our decision in *State v. Ring*, 200 Ariz. 267, 25 P.3d 1139 (2001) (*Ring I*), and remanded for further proceedings consistent with its decision.   *Ring II,* 536 U.S. at ___, 122 S. Ct. at 2443.   Following the *Ring II* decision, we consolidated all death penalty cases in which this court had not yet issued a direct appeal mandate, including Lamar's, and stated that we would order supplemental briefing on sentencing issues affected by *Ring II* after issuance of our decision in *State v. Ring,* __ Ariz. __, 65 P.3d 915 (2003) (*Ring III*).   We have directed the parties to submit supplemental briefing in accordance with the *Ring III* opinion and will address sentencing issues in a supplemental opinion.

## VI.

¶56       For the foregoing reasons, we affirm Lamar's convictions

26

for first degree murder and kidnapping.

_____
Ruth V. McGregor, Vice Chief Justice

CONCURRING:

_____
Charles E. Jones, Chief Justice

_____
Rebecca White Berch, Justice

_____
Michael D. Ryan, Justice

_____
William F. Garbarino, Judge[*]

_____

[*] The Honorable Andrew D. Hurwitz recused himself. Pursuant to Article VI, Section 3 of the Arizona Constitution, the Honorable William F. Garbarino, Judge of the Arizona Court of Appeals, Division One, was designated to sit in Justice Hurwitz's place.

27