SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-03-0022-AP |
| Appellee, | ) | |
| | ) | Maricopa County Superior |
| v. | ) | Court |
| | ) | No. CR 2000-006872 |
| RICHARD J. GLASSEL, | ) | |
| | ) | |
| Appellant. | ) | **O P I N I O N** |
| _____ | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Peter C. Reinstein, Judge

**AFFIRMED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                     Phoenix
      By   Kent E. Cattani, Chief Counsel,
           Capital Litigation Section
           Robert L. Ellman, Assistant Attorney General
Attorneys for State of Arizona

JAMES J. HAAS, MARICOPA COUNTY PUBLIC DEFENDER             Phoenix
      By   James R. Rummage, Deputy Public Defender
           Garrett W. Simpson, Deputy Public Defender
Attorneys for Richard J. Glassel
_____

**R Y A N**, Justice

¶1      A Maricopa County jury convicted Appellant Richard Jock Glassel of two counts of premeditated first degree murder for the April 19, 2000, murders of Nila Lynn and Esther LaPlante.  The jury also convicted Glassel of thirty counts of attempted first degree murder.  Following aggravation and penalty hearings, the jury determined that death sentences were

appropriate for the two murders. The trial court imposed the two death sentences and also imposed aggravated concurrent and consecutive sentences for the attempted murder convictions, which totaled 351 years in prison. An automatic notice of appeal was filed under Rules 26.15 and 31.2(b), Arizona Rules of Criminal Procedure, and Arizona Revised Statutes ("A.R.S.") section 13-4031 (2001). This Court has jurisdiction under Article 6, Section 5.3 of the Arizona Constitution and A.R.S. § 13-4031.

**I**

**A**

¶2 Glassel, who owned a home at Ventana Lakes, had several disputes with the Ventana Lakes Homeowners Association. The first dispute concerned people parking in front of mailboxes near Glassel's house. The second dispute involved landscapers doing yard maintenance on Glassel's property. The third related to Glassel's extended picketing of the Lennar Homes sales office.

¶3 The mailbox dispute arose because Glassel believed that gas fumes from cars parked in front of the mailboxes came into his house. Glassel dealt with the situation by parking his car directly in front of the mailboxes. Glassel was asked by Ms. Ramsland, a representative of the Homeowners Association, to move his car, but he refused. After repeated complaints, the

car was towed; Glassel then went to Ramsland's office and yelled at her for having it towed.

¶4 Several months later, Glassel became agitated because landscapers were trimming his bushes and trees against his wishes. When members of the Homeowners Association's Landscaping Committee tried to explain to Glassel that they had to do the maintenance, Glassel became belligerent and aggressive. The Homeowners Association filed a lawsuit against Glassel because he would not let the landscapers trim the trees or bushes.

¶5 The final dispute, Glassel's picketing of the Lennar Homes sales office, seems to have arisen from the previous disputes.[1] In February 1999, a member of the Homeowners Association and Glassel argued over the picketing. Glassel then told a friend that the Homeowners Association had not heard the last of him and that he would get even. Eventually, Glassel's house was foreclosed upon, and he moved to California.

¶6 More than a year later, on April 19, 2000, the Homeowners Association held a regularly scheduled meeting. Duane Lynn and Esther LaPlante, members of the Board, were seated at the head table. Nila Lynn, Duane Lynn's wife, was seated in the audience. The meeting was recorded. In addition

---

[1] While the record is not clear on this point, it appears that Glassel believed that Lennar Homes and the Homeowners Association were identical entities.

to the people attending the Homeowners Association meeting, others were in nearby rooms playing cards.

¶7        The day before, Glassel had returned to Arizona from California. He rented a truck and cleaned out a storage locker in which he apparently had stored several weapons and ammunition. He drove to Ventana Lakes while the April 19 meeting was taking place and parked in front of the building. Glassel walked into the meeting armed with an AR-15 assault rifle, fully loaded with thirty rounds of ammunition, two fully loaded 9-millimeter pistols and a ten-round .22 caliber pistol. He carried 384 rounds of ammunition[2] and had another 369 rounds in his truck.

¶8        Lyle and Beverley Baade were leaving the meeting when they encountered Glassel. Glassel said, "You're not going anywhere." Lyle then responded that they were going to the doctor. Glassel told them to "[g]o back and sit down." When Lyle said that he had a doctor's appointment, Glassel shoved him in the left shoulder, telling Lyle, "I said go back and sit down." Lyle then noticed that Glassel was carrying a pistol and yelled out, "He's got a gun." Glassel said, "I am going to kill you all" or "I'm going to kill all of you." He then fired eight

---

[2]        Three hundred seventy-three rounds of live ammunition were found inside the meeting room. In addition, Glassel discharged ten rounds from the .22 caliber pistol and one round from the AR-15.

- 4 -

shots in rapid succession from the .22 caliber pistol, paused briefly, and then fired the last two rounds. One bullet struck Nila Lynn in the back, killing her. Esther LaPlante was struck in the arm and head and also died. One other man was shot in the abdomen and another in the thigh.

¶9       When the pistol was out of bullets, Glassel put it down and reached for the AR-15 assault rifle. Lyle rushed Glassel and tackled him, struggling to gain control of the rifle. Despite Lyle's efforts, Glassel managed to get a finger to the trigger and fired one shot. The bullet hit yet another man in the foot, causing him to lose a toe. As Lyle and Glassel struggled, Beverley Baade cried for help. Several people responded and held Glassel down until police arrived. A woman at the scene and asked Glassel why he had done it. Glassel answered, "I did it to get even, you fucking sons-of-bitches," or "They fucked me long enough. I'm getting even."

**B**

¶10      On April 26, 2000, a Maricopa County grand jury indicted Glassel with two counts of first degree murder and thirty counts of attempted first degree murder. The Maricopa County Public Defender's Office was appointed to represent him.

¶11      On December 10, 2001, Glassel filed a pro per motion to change counsel. The trial judge denied that motion. Glassel then filed a pro per motion to represent himself. On January

14, 2002, the trial judge reconsidered the December 10 motion and appointed an attorney from the Maricopa County Legal Defender's Office to be Glassel's new defense counsel and set the trial for September 23, 2002.

¶12     On June 24, 2002, the United States Supreme Court decided *Ring v. Arizona*, which held that capital defendants "are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. 584, 589 (2002) (*Ring II*).     The legislature subsequently amended Arizona's death penalty statutes, A.R.S. §§ 13-703 to -703.05, effective on August 1, 2002.     2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, §§ 1, 3.     The amended sentencing statutes assigned to juries the responsibility of finding aggravating circumstances and determining whether to impose the death penalty.     A.R.S. §§ 13-703, -703.01 (Supp. 2004).

¶13     Glassel's attorney informed the trial court that he would not be ready to try the case on September 23 if the new death penalty statutes applied, claiming that he would not have enough time to prepare mitigation evidence before trial.[3] Counsel also indicated that he had had personal problems in his family that made it difficult to prepare for trial.

---

[3]     Before *Ring II*, there normally was a period between the guilt and sentencing phase during which the defense was able to gather mitigation evidence.

**¶14** Counsel filed a motion to continue, which was granted, and trial was set for November 18, 2002.[4] On November 7, 2002, Glassel's attorney filed a motion to withdraw, which the superior court denied.

**¶15** After a five-day trial, the jury found Glassel guilty on all counts charged. The jury further found for each count of attempted murder that Glassel "commit[ed] a dangerous offense by use or threatening exhibition of a deadly weapon." A.R.S. § 13-604(I) (Supp. 1999).

**¶16** In the aggravation phase, the jury found that two or more murders were committed during the commission of the offense. *See* A.R.S. § 13-703(F)(8) (Supp. 2003). In the penalty phase, the jury concluded that any mitigation was insufficient to call for leniency, and determined that Glassel should be sentenced to death.

**II**

**¶17** Glassel first argues that the application of the new death penalty statute, A.R.S. § 13-703.01, to his case constitutes an *ex post facto* violation under Article I, Section 10, Clause 1 of the United States Constitution and Article 2, Section 25 of the Arizona Constitution, as well as A.R.S. § 1-

---

4 The judge granted the motion to continue because Glassel's attorney was involved in an existing trial, not because of his arguments regarding the problems posed by juries imposing the death sentence.

244 (2002). We have previously held that A.R.S. § 13-703.01 is not an *ex post facto* violation because the change in the statutory method was merely procedural. *State v. Ring*, 204 Ariz. 534, 547, ¶ 23, 65 P.3d 915, 928 (2003) (*Ring III*) (citing *Dobbert v. Florida*, 432 U.S. 282 (1977)). The United States Supreme Court reached the same conclusion in *Schriro v. Summerlin*, 542 U.S. 348, 124 S. Ct. 2519 (2004). In *Schriro*, the Court considered whether its decision in *Ring II* applied retroactively to cases already final on direct review, and concluded that it did not because *Ring II* announced a new procedural, rather than a substantive, rule. *Id.* at __, 124 S. Ct. at 2523 (quoting *Ring II*, 536 U.S. at 609) (citations omitted).

¶18  Glassel presents no argument that would compel us to revisit *Ring III*. We recently rejected similar arguments in *State v. Anderson*, 210 Ariz. 327, 346, ¶¶ 74, 76-77, 111 P.3d 369, 388 (2005), and *State v. Roseberry*, 210 Ariz. 360, ___, ¶ 18, 111 P.3d 402, 406-07 (2005), and therefore reject Glassel's contentions.

### III

¶19  Glassel next argues that the trial court abused its discretion when it found him competent to stand trial. "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object

- 8 -

of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). Glassel claims that although he might have had a factual understanding of the proceedings, he did not have the ability to consult with his lawyer with a reasonable degree of rational understanding.

**A**

¶20    The superior court assigned Dr. Jack Potts, a psychiatrist, to evaluate Glassel. Dr. Potts reported that he thought there were reasonable grounds for further examination of Glassel. *See* Ariz. R. Crim. Proc. 11.2(c) & (d). He found that Glassel had a factual appreciation of the proceedings against him but not a rational appreciation. According to Dr. Potts, factual appreciation means an understanding of the roles individuals play in the legal proceedings and the cognitive ability to understand the nature of the proceedings. A rational appreciation means the ability to use that factual understanding and apply it in an appropriate fashion. He also concluded that Glassel's deficiencies rendered him unable to assist his counsel in his defense. He ultimately concluded that Glassel was not competent to stand trial and that he should be sent to the State Hospital for further treatment and diagnosis.

¶21    The trial court later appointed Dr. Michael Brad Bayless, a forensic psychologist, to evaluate Glassel. When Dr.

Bayless examined Glassel, he told Dr. Bayless that there was a conspiracy involving the president of the Homeowners Association, Lennar Construction, the police, and the judge. Glassel claimed that he had taken tape recordings to the FBI and that the police were harassing him. He told Dr. Bayless he believed that the Homeowners Association president was behind a conspiracy at the jail, involving both inmates and guards, to kill him. Dr. Bayless later pointed out, however, that Glassel was not sufficiently terrified by the conspiracy to stop taking medication offered by the jail or to stop eating food provided to him. Nor was he unable to make inmate requests in a rational manner.

¶22 Dr. Bayless concluded that Glassel was suffering from a paranoid personality disorder and possibly a depressive disorder. He believed, however, that Glassel understood the nature of the charges and proceedings against him, the roles of the various participants in the criminal justice system, and his constitutional rights. Dr. Bayless, moreover, determined that Glassel was capable of assisting his attorney in his own defense and competent to stand trial.

¶23 The trial court also appointed Dr. Martin B. Kassel, a psychiatrist, to evaluate Glassel. He interviewed Glassel for more than an hour. In his report, Dr. Kassel concluded that Glassel was competent, although he stated that it was "a very,

very difficult case" and a "coin toss." He wrote in his report, however, that although Glassel refused to admit that he had a mental illness, Glassel had a paranoid personality disorder and was narcissistic and somewhat grandiose.

¶24    A competency hearing was held in August 2001. The day before the hearing, Glassel's first defense counsel faxed a letter to Dr. Kassel. The letter indicated that Glassel had "processed" defense counsel into his paranoid delusions and that he considered her to be part of the conspiracy. Defense counsel alleged that Glassel had become angry with her because he thought that she refused to secure him certain privileges in jail. He claimed that she and everyone in the public defender's office were part of the conspiracy.[5] Based on the information in that letter, Dr. Kassel changed his opinion because he no longer believed that Glassel was able to assist his counsel in preparing a defense.

¶25    After the competency hearing, the trial judge found Dr. Bayless' opinion to be persuasive and ruled Glassel competent to stand trial. The trial judge based his findings also in part on his own observations of Glassel in the

---

[5]    Glassel also believed that the court was involved in the conspiracy. When the trial judge denied Glassel's pro per motion to change counsel, Glassel responded, "You can tell your friend John McCain you have been doing an excellent job for him." When the trial judge informed Glassel that he did not know Senator John McCain, Glassel responded, "I'm sure you do. This proves you're part of the conspiracy."

courtroom.  He stated that "[t]he Court cannot exclude in its final analysis of the Defendant's competency, the Court's own observations of the Defendant during his frequent court appearances."

¶26    In November 2002, Glassel requested a new competency hearing, arguing that his condition had worsened and that there was new evidence of incompetence not available during the first hearing.  Glassel's second counsel argued that he believed that Glassel had incorporated him into his paranoia.  The trial court denied that motion.

## B

¶27    We review a trial court's finding of competency for abuse of discretion.  *State v. Brewer*, 170 Ariz. 486, 495, 826 P.2d 783, 792 (1992).  We must determine whether reasonable evidence supports the trial court's finding that the defendant was competent, considering the facts in the light most favorable to sustaining the trial court's finding.  *Id.*

¶28    Although another finder of fact might have resolved the competency issue differently, we cannot conclude that the trial judge abused his discretion in finding Glassel competent to stand trial.  The judge based his findings not only on Dr. Bayless' testimony but also on his own observations of Glassel's interactions with his counsel in the courtroom.  *See State v. Arnoldi*, 176 Ariz. 236, 239, 860 P.2d 503, 506 (App. 1993)

(holding that a trial judge can rely on personal observations in determining competency) (citing *State v. Bishop*, 162 Ariz. 103, 106, 107, 781 P.2d 581, 584, 585 (1989)).

¶29    Glassel points to the following exchange between defense counsel and Dr. Bayless as evidence that the trial court abused its discretion in finding Glassel competent to stand trial:

> Q.  Do you remember telling me that . . . "spending time on competency is a waste of time because they'll just make him competent anyway"?
>
> A.  He will be found competent.  He will be made competent, more than likely, unless there is something I missed or all the other doctors missed either.  If he is at the State Hospital, they'll treat him and send him back.  That's usually what happens, okay? Very rarely does that not happen.

Glassel correctly contends that the fact that he would probably be restored to competency is not a "waste of time."  But the superior court was not precluded from crediting Dr. Bayless' ultimate opinion on Glassel's competency simply because of this one misstatement by the expert.  "The trial judge may rely on some testimony from one expert and other testimony from another expert and draw his own conclusions."  *State v. Bishop*, 162 Ariz. 103, 107, 781 P.2d 581, 585 (1989).  In addition, "[t]he trial judge is not required to accept or reject expert testimony in toto and may rely on particular views of one or more experts even though he or she may disagree with the expert's ultimate

conclusion." *Id.*

¶30    Finally, we conclude that the superior court did not abuse its discretion in finding Glassel competent to stand trial despite evidence that Glassel's condition worsened after the original competency hearing and that he had incorporated his new counsel into his conspiracy delusions.[6]    Neither fact is inconsistent with the trial court's original conclusion that Glassel, although mentally ill, was nonetheless competent to stand trial.

¶31    Because the trial judge had the opportunity to observe Glassel during court proceedings and had the ability to evaluate the conflicting expert testimony, we cannot conclude on this record that the superior court abused its discretion in finding Glassel competent to stand trial.    *See Brewer*, 170 Ariz. at 495, 826 P.2d at 792.

**IV**

¶32    Glassel next argues that the trial court erred by

---

[6]    The "new evidence" of Glassel's alleged incompetence stemmed solely from visits an investigator from the Office of the Legal Defender had with Glassel.  Counsel contends that the investigator had twenty in-person visits and numerous telephone conversations with Glassel – amounting to more than fifty hours of contact with him – and that that contact suggests that Glassel had incorporated his second trial counsel into his paranoia. That evidence, however, was insufficient to have compelled the trial court to order a new competency hearing.  If there indeed was new evidence of Glassel's incompetency stemming from those meetings, then counsel should have included that evidence in his motion for a new competency hearing.

- 14 -

denying Glassel sufficient opportunity to *voir dire* the potential jurors about their understanding of the phrase "sufficiently substantial to call for leniency."  *See* A.R.S. § 13-703.01(G) ("At the penalty phase, the defendant and the state may present any evidence that is relevant to the determination of whether there is mitigation that is sufficiently substantial to call for leniency.").  The trial court concluded that it was "up to each juror to determine what is sufficiently substantial" to call for leniency.

**A**

¶33    Glassel contends that under *Morgan v. Illinois*, 504 U.S. 719, 728 (1992), a defendant must be permitted to use *voir dire* to reveal potential jurors who will never vote for leniency.  According to Glassel, his questions regarding the "sufficiently substantial to call for leniency" language were designed to determine which prospective jurors could not be lenient.

¶34    Glassel further asserts that Rule 18.5 of the Arizona Rules of Criminal Procedure and *State v. Anderson*, 197 Ariz. 314, 320-21, ¶ 14, 4 P.3d 369, 375-76 (2000), required the trial court to allow Glassel to ask his questions.  Rule 18.5(d) provides:

> The court shall conduct a thorough oral examination of prospective jurors.  Upon the request of any party, the court shall permit that party a reasonable time to

- 15 -

conduct a further oral examination of the prospective jurors. The court may impose reasonable limitations with respect to questions allowed during a party's examination of the prospective jurors, giving due regard to the purpose of such examination. In addition, the court may terminate or limit voir dire on grounds of abuse. Nothing in this Rule shall preclude the use of written questionnaires to be completed by the prospective jurors, in addition to oral examination.

Ariz. R. Crim. P. 18.5(d).

¶35    In *Anderson*, three potential jurors indicated on their written questionnaires that they were opposed to the death penalty on moral or religious grounds and that they could not set aside those beliefs. *Anderson*, 197 Ariz. at 318, ¶ 5, 4 P.3d at 373. The trial court then excluded them from the jury pool for cause. *Id.* We reversed, holding that Rule 18.5 requires that the defense be given the opportunity to question the potential jurors to determine whether they could set aside their personal beliefs and render a fair and impartial verdict. *Id.* at 320-21, 324, ¶¶ 14, 24, 4 P.3d at 375-76, 379. We explained, however, that the right to *voir dire* a jury is not absolute: "The wording of the amended rule requiring a reasonable examination on request of either party is not ambiguous. A reasonable amount of time necessarily includes some amount of time to question on a key issue, subject, as the rule says, to limit or termination to prevent abuse." *Id.* at 320-21, ¶ 14, 4 P.3d at 375-76.

¶36     We review a trial court's rulings on *voir dire* of prospective jurors for abuse of discretion. *State v. Trostle*, 191 Ariz. 4, 12, 951 P.2d 869, 877 (1997). We also review motions to strike the panel for abuse of discretion. *State v. Carlson*, 202 Ariz. 570, 579, ¶ 29, 48 P.3d 1180, 1189 (2002).

**1**

¶37     Glassel contends that *Morgan* gives defendants the right to question a prospective juror to assess the likelihood that the prospective juror will assign substantial weight to the mitigation evidence the defendant plans to offer. *Morgan*'s holding, however, is considerably narrower: "[D]efendants have a right to know whether a potential juror will automatically impose the death penalty once guilt is found, regardless of the law," and "[t]hus, defendants are entitled to address that issue during *voir dire*." *State v. Jones*, 197 Ariz. 290, 303, ¶ 27, 4 P.3d 345, 358 (2000) (construing *Morgan*). However, "[t]he Constitution . . . does not dictate a catechism for *voir dire*," *Morgan*, 504 U.S. at 729, and trial courts have "great latitude in deciding what questions should be asked on *voir dire*." *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991).

¶38     The trial court here fully complied with the *Morgan* requirements. The court required each potential juror to fill out a jury questionnaire, which contained six questions about

predispositions on capital punishment. Two questions specifically addressed the *Morgan* issue. Moreover, the trial court conducted individual *voir dire* of every prospective juror whose responses to the questionnaire suggested an inability to deliberate impartially or a predisposition to impose the death penalty regardless of the mitigation evidence. Those potential jurors were either rehabilitated or dismissed. Glassel has not identified a single juror who deliberated notwithstanding an unwillingness to consider mitigation evidence. Every juror selected answered "no" to the direct *Morgan* question on the questionnaire: "Conversely, will you, for whatever reason, automatically vote <u>for</u> the death penalty without considering the evidence and the instructions of law that will be presented to you?"

¶39 Nevertheless, Glassel argues that because some panelists were "over-the-top" in their answers, a series of questions regarding the definition of "sufficiently substantial to call for leniency" was necessary under *Morgan*. But Glassel does not specify how the panelists were "over-the-top." As discussed above, questionable prospective jurors were either rehabilitated or dismissed. In addition, eleven of the twelve jurors actually impaneled indicated on their questionnaires that they were not opposed to the death penalty but that it should be used only in very special circumstances. The sole exception was

juror number 30, who answered affirmatively to the following question: "I feel the death penalty should be imposed in all cases where the State has proven beyond a reasonable doubt that a person killed another with premeditation." That juror, however, was rehabilitated after extensive individual *voir dire* of him, which convinced the trial court that juror 30 could be impartial. After that *voir dire* of juror 30, Glassel did not ask the court to strike the juror.

**2**

¶**40** Glassel's proposed questions concerning the prospective jurors' understanding of the phrase "sufficiently substantial to call for leniency" did not further the *Morgan* inquiry because the questions did not address the issue of whether a juror would automatically impose the death sentence regardless of the jury instructions or mitigation evidence. Instead, Glassel's proposed inquiry was to elicit each panelist's understanding of the phrase "sufficiently substantial to call for leniency." But, as we have noted, the phrase is "inherently subjective" and not the equivalent of a "mathematical formula." *State v. Hoskins*, 199 Ariz. 127, 154, ¶ 123, 14 P.3d 997, 1024 (2000). Because the jury is asked, as is this Court in the context of its independent review of a death sentence, to exercise its subjective judgment as to the weight of the actual evidence of aggravation and mitigation, *see State*

*v. Barrerras*, 181 Ariz. 516, 521, 892 P.2d 852, 857 (1995), we cannot conclude that the trial court abused its discretion in refusing to allow the requested questions.

¶41    Moreover, the trial court did permit Glassel to question some potential jurors about their understanding of the phrase.  Of the nine jurors Glassel wanted to question further, the trial court prevented Glassel from questioning only two: jurors number 4 and 60.  Thus, except with respect to jurors 4 and 60, Glassel's real argument is not that he was precluded from asking about the definition of the phrase "sufficiently substantial to call for leniency," but that he was prohibited from asking enough *follow-up* questions regarding the jurors' understanding of the phrase.  But he does not specify what particular questions the trial court prevented him from asking or how he was prejudiced.  Additionally, because neither juror 4 nor juror 60 took part in deliberations, any error with respect to them is harmless.  *See State v. Hickman*, 205 Ariz. 192, 198-99, 201, ¶¶ 29, 41, 68 P.3d 418, 424-25, 427 (2003) (holding that a court's error in failing to strike potential jurors for cause was subject to harmless error review because even though the defendant had to exercise peremptory challenges on those potential jurors, he did not use all of his peremptory challenges).

¶42    Glassel also contends that the trial court abused its discretion by refusing to allow him to ask potential jurors open-ended questions about what sort of mitigating evidence would be important to them in deciding whether to impose the death penalty.  Glassel asserts that the trial court instead permitted only questions about specific mitigating facts.

¶43    Glassel argues, therefore, that open-ended *voir dire* is necessary to determine which prospective jurors, in violation of *Morgan*, would automatically impose the death sentence despite the "jurors' bland assurances that they could be fair and impartial."

¶44    Glassel cites no authority to support his argument that a trial court abuses its discretion by refusing to allow defendants to ask potential jurors what types of evidence they will consider to be mitigating.  The trial court, moreover, did permit Glassel to ask open-ended questions on several occasions.[7]

---

[7]    Defense counsel asked juror 4, "I guess what I'm wondering, what sort of mitigating circumstances would be important to you?"  He also asked juror 9, "What sorts of things do you think would be mitigating in a death penalty case?"  He inquired of juror 10 what mitigating circumstances meant to him.  He asked juror 3, "When you say you could fairly consider mitigation, what does that mean to you?"  He questioned juror 5 as follows: "I mean other than just the way you're instructed, what do mitigating circumstances mean to you?"  He asked another juror "What would be factors that would be relevant to you or important to you in determining mitigation, in other words, less moral culpability?"  He asked juror 39, "What does mitigating

Accordingly, Glassel has failed to show an abuse of discretion by the trial court.

## VI

¶45     Glassel next argues that the trial court violated his right to a fairly selected jury, his right to be free from cruel and unusual punishment, and his rights to fundamental fairness and due process of law under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when it struck from the panel prospective jurors who had merely general objections to the death penalty and when it refused to strike certain prospective jurors for cause.

¶46     We review a trial court's decision whether to strike jurors for cause for abuse of discretion. *Jones*, 197 Ariz. at 302, ¶ 24, 4 P.3d at 357 (holding that "[t]he trial judge has the power to decide whether a venire person's views would actually impair his ability to apply the law. For this reason, 'deference must be paid to the trial judge who sees and hears the juror'") (quoting *Wainwright v. Witt*, 469 U.S. 412, 426 (1985)); *State v. Medina*, 193 Ariz. 504, 511, ¶ 18, 975 P.2d 94, 101 (1999) ("A trial court's decision not to excuse a juror for cause will be set aside only for a clear abuse of discretion.").

---

circumstances mean to you?"  He asked juror 49, "[W]hat does the idea of mitigation mean to you?"

**A**

¶47     The Supreme Court has held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968).  We recently discussed *Witherspoon* and a trial judge's role in *voir dire*:

> The Supreme Court has held that potential jurors may not be removed for cause "simply because they voiced general objections to the death penalty." *Witherspoon v. Illinois*, 391 U.S. 510, 522-23, 88 S. Ct. 1770, 20 L.Ed.2d 776 (1968).  However, the trial judge is permitted to question jurors regarding their opinions on the death penalty, *see, e.g.*, *State v. Anderson*, 197 Ariz. 314, 318-19, ¶¶ 7-10, 4 P.3d 369, 373-74 (2000), and, after attempting rehabilitation, may remove a potential juror from the jury pool if the juror's personal views may "prevent or substantially impair the performance of [the juror's] duties." *Wainright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 65 L.Ed.2d 581 (1980)). Deference is to be accorded to the trial judge and a juror's bias need not be proved with unmistakable clarity. *Id.* at 424-25, 105 S. Ct. 844.

*State v. Moody*, 208 Ariz. 424, 450, ¶ 88, 94 P.3d 1119, 1145 (2004).

¶48     Glassel identifies four prospective jurors who he claims should not have been removed under *Witherspoon*:  jurors number 16, 32, 46, and 65.

¶49     On his questionnaire, juror 16 wrote that capital

punishment was "barbaric and unsuitable for an advanced nation." During *voir dire*, he confirmed that those were his beliefs and stated that he was against the death penalty "absolutely." Despite the juror's claim that he could follow the law, the superior court excused him, noting that he equivocated about whether he would take his personal biases into the jury room.

¶50 Trial judges are permitted to determine a potential juror's credibility when deciding whether to strike a juror for cause. The *Witherspoon* determination "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province," and the trial judge's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." *Wainwright*, 469 U.S. at 428-29. The standard, moreover, "is whether the juror's views would 'prevent or *substantially impair* the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424 (emphasis added) (citations omitted). Thus, even assuming that juror 16 was sincere about being able to apply the law, the judge could have reasonably determined that the juror's views would substantially impair his ability to deliberate impartially. Consequently, we cannot conclude that the trial court abused its discretion when it struck juror 16 for cause.

¶51 Glassel argues that the court abused its discretion

when it struck juror 32 because he gave assurances that he would be fair notwithstanding his anti-death penalty beliefs.   Juror 32's responses on the jury questionnaire and during *voir dire*, however, demonstrate that he could not vote to impose a death sentence.   On the questionnaire, he stated that his views on the death penalty were so strong that he was reluctant to sit on the jury.   Specifically, he wrote, "[T]his would not sit well with me."   During *voir dire*, the following exchange occurred between the State and juror 32:

> [PROSECUTOR]:  In fairness to both sides, do you feel that [your views on the death penalty] would interfere substantially with your ability to be a juror?
>
> [JUROR 32]:  Yes.
>
> [PROSECUTOR]:  So that we're square on that.
>
> [JUROR 32]:  Yes.
>
> [PROSECUTOR]:  It would substantially interfere with your ability to be a juror in this case?
>
> [JUROR 32]:  Yes.

After some arguably rehabilitative answers in response to questions by defense counsel, the following exchange occurred:

> [PROSECUTOR]:  In the phase of:  I vote for the death penalty or I don't vote for the death penalty, would your vote be:  I don't vote for the death penalty?
>
> [JUROR 32]:  That's correct.
>
> [PROSECUTOR]:  Anytime you were given a case to vote on the death penalty, your vote would be against the death penalty?

[JUROR 32]:  Correct.

THE COURT:  Not withstanding [sic] the fact that it may be difficult, could you do it [impose a death sentence]?

[JUROR 32]:  No.

THE COURT:  [Defense Counsel]?

[DEFENSE COUNSEL]:  You're telling us that it doesn't matter what the law is?  It doesn't matter what the facts are, you're going to vote for life no matter what the evidence or the law is in the end?

[JUROR 32]:  Yes, I just don't want to be a part of it.

In light of juror 32's statements, we cannot conclude that the court abused its discretion in removing him for cause.

¶52     Glassel argues that juror 46 was wrongly removed because she merely had general objections to the death penalty. On her questionnaire, however, she wrote that she did not believe that anyone should receive the death penalty "regardless of the crime committed."  She also wrote that "we do not have the right to take another life" and that she held that belief "morally, personally, and religiously."  She did answer "no" to the question that asked if her beliefs were "so strongly held" that she would be reluctant to sit on the jury, but her responses during *voir dire* raised doubts about her impartiality:

[PROSECUTOR]:  Well, what you're telling us really – to get right to the bottom of it – is that if there are any mitigating circumstances presented in this case, you are always going to vote in favor of a life sentence rather than death?

[JUROR 46]:  I probably would, yes.

[PROSECUTOR]:  And you cannot envision or you don't even believe there would be a circumstance where there would be no mitigating circumstances?

[JUROR 46]:  I think when it comes to heinous crimes or murders, there is {sic} always mitigating circumstances.

[PROSECUTOR]:  If the defendant presented absolutely no mitigation and it's the burden of the defendant to prove mitigation to the jury, if the defendant were to present no mitigation, the law says that the jury shall impose a sentence of death.

[JUROR 46]:  Uh-huh.

[PROSECUTOR]:  That's mandatory.

[JUROR 46]:  I understand that.

[PROSECUTOR]:  Would you be able to do that?

[JUROR 46]:  If there was no mitigating circumstances, no [sic], but I believe there always are mitigating circumstances.

These exchanges, in conjunction with her earlier statements that she would find mitigating circumstances 99 or 100 percent of the time and that she saw herself as a representative of the "cross-section of society" that did not believe in the death penalty, support the trial court's decision to dismiss her.

¶53      Glassel claims that the court abused its discretion when it struck juror 65 for cause because she stated that although her anti-death penalty position would factor into the decision whether to impose the death penalty, "I don't think

it's so large I couldn't follow the law." On the jury questionnaire, however, juror 65 repeatedly indicated an unwillingness to impose the death penalty. Her response to one question stated, "I am not opposed to the death penalty, but I am not sure I could personally make the decision to impose it." In answer to another question, she wrote that it would "be difficult" for her to make the decision to impose the death penalty. In response to yet another question, she declared, "I don't know if I could vote to put someone to death, no matter what they did." In answer to another question, which asked whether she would automatically vote against the death penalty without considering the evidence and instructions, she wrote, "I'm not sure." Finally, she responded, "I would be fair and impartial. I just have difficulty with making the decision to put someone to death."

¶54        During *voir dire*, juror 65 continued to express her concerns over imposing the death penalty. The following are some of her exchanges with the prosecutor during *voir dire*:

> [PROSECUTOR]: Could you see yourself voting for the death penalty in a case where aggravation is provided and there are no mitigating factors sufficiently substantial to call for leniency?
>
> [JUROR 65]: No.
>
> ***
>
> [PROSECUTOR]: [Could you make the decision to put someone to death if the law required it?]

[JUROR 65]: Honestly, I say I couldn't. If you want an answer, I couldn't. I do think that I could follow the law. I work with the law agents different [sic], and I think I'm logical; but I really have trouble with that.

[PROSECUTOR]: Your final answer, at least to me for now is, "I couldn't do that."

[JUROR 65]: Sure.

¶55 In light of juror 65's responses during *voir dire* and her answers to the jury questionnaire, it was not an abuse of discretion for the trial court to remove her for cause.

**B**

¶56 As discussed above, *Morgan*, 504 U.S. at 728, requires that defendants have the opportunity to use *voir dire* to reveal jurors who will never vote for leniency. Under *Morgan*, because "defendants have a right to know whether a potential juror will automatically impose the death penalty once guilt is found, regardless of the law," capital defendants are entitled to address that issue during *voir dire*. *Jones*, 197 Ariz. at 303 ¶ 27, 4 P.3d at 358.

¶57 Glassel identifies six prospective jurors who he claims should have been removed under *Morgan*: Jurors number 5, 10, 14, 18, 36, and 39. None of those prospective jurors, however, was selected. Consequently, any error in refusing to strike them was harmless. *See Hickman*, 205 Ariz. at 198-99, 201 ¶¶ 29, 41, 68 P.3d at 424-25, 427.

**¶58** The trial court gave the reasonable doubt instruction mandated by this Court in *State v. Portillo*, 182 Ariz. 592, 898 P.2d 970 (1995).[8] Glassel contends that *Portillo* should be overruled. Glassel recognizes that this Court has previously rejected challenges to the *Portillo* instruction, *see State v. Lamar*, 205 Ariz. 431, 440-41, ¶¶ 48-49, 72 P.3d 831, 840-41 (2003) (citing cases), but asks us to reconsider the issue. We declined that invitation in *Lamar*, *see id.*, and do so again today.

---

[8] The court instructed the jury as follows:

> As to reasonable doubt, the law does not require a defendant to prove innocence. Every defendant is presumed by law to be innocent. The State has the burden of proving the defendant guilty beyond a reasonable doubt. This means the State must prove each element of the charges beyond a reasonable doubt.
>
> In civil cases it is only necessary to prove that a fact is more likely true than not or that its truth is highly probable. In criminal cases, such as this, the State's proof must be much more powerful than that; it must be beyond a reasonable doubt. Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world we know with absolute certainty, and in criminal cases it does not require proof that overcomes every doubt. If, based upon your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If, on the other hand, you think that there's a real possibility that the defendant is not guilty, you must give him the benefit of the doubt and find him not guilty.

¶59    Glassel next argues that he was denied his Sixth Amendment right to counsel at the penalty phase of the trial. We review this question *de novo*. *See Moody*, 208 Ariz. at 445, ¶ 62, 94 P.3d at 1140; *Frazer v. United States*, 18 F.3d 778, 781 (9th Cir. 1994).

**A**

¶60    In October 2002, Glassel's second defense counsel repeatedly told the court that he was not prepared to call any mitigation witnesses.  On November 19, defense counsel again told the court that he was not ready to proceed. He also attempted to withdraw from the case.

¶61    In the penalty phase of the trial, defense counsel presented no witnesses, instead relying on evidence developed during the trial about Glassel's age and lack of any prior criminal history.  Although defense counsel did not present evidence, he objected to the State's opening statement in which it said that Glassel was in good health and did not suffer from mental illness.  Defense counsel argued that the State was speculating about Glassel's physical and mental health.  He then suggested that something "happened with" Glassel, something that caused him "to go over the edge."  He also mentioned that Glassel had prepared what counsel characterized as a suicide note before committing the crimes.

¶62      "[A] trial is unfair if the accused is denied counsel at a critical stage of his trial." *United States v. Cronic*, 466 U.S. 648, 659 (1984).  "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable."  *Id.* Indeed, *Cronic* explained that "[t]he Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding."  *Id.* n.25.

¶63      In *Bell v. Cone*, however, the Court clarified *Cronic* by stating that an "attorney's failure must be *complete*." 535 U.S. 685, 697 (2002) (emphasis added).  It then explained why the defendant's argument that his counsel entirely neglected to subject the prosecutor's case to meaningful adversarial testing failed:  "Here, respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points."  *Id.*  Glassel argues that his counsel's conduct, unlike the conduct of the attorney in *Cone*, satisfies the *Cronic* standard.  We disagree.

¶64      Glassel   has   not   demonstrated   a   Sixth   Amendment

violation. Despite defense counsel's decision not to present any mental health experts at the penalty phase of the sentencing proceeding, the record does not establish that his "counsel *entirely* fail[ed] to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659 (emphasis added). In addition to giving an opening statement and closing argument at the penalty phase, defense counsel argued that the jury should accept three mitigating circumstances: age, lack of criminal history, and no record of prior violent crimes. Accordingly, we conclude that on this record, we cannot find that Glassel was denied the right to counsel.[9]

**IX**

¶65 Glassel argues that Arizona's capital sentencing scheme, which requires that any mitigation evidence be "sufficiently substantial to call for leniency," *see* A.R.S. § 13-703.01(G), is vague, shifts the burden of proof, and creates an unconstitutional presumption of death. We review the validity of a statute *de novo* and construe it, whenever possible, to uphold its constitutionality. *State v. Davolt*, 207

---

[9] This does not mean, however, that Glassel is without a remedy. He can raise a claim of ineffective assistance of counsel in a Rule 32 petition for post-conviction relief. *See State v. Spreitz*, 202 Ariz. 1, 3, ¶ 9, 39 P.3d 525, 527 (2002) (holding that any ineffective assistance of counsel claims must be brought in Rule 32 post-conviction proceedings).

Ariz. 191, 214, ¶ 99, 84 P.3d 456, 479 (2004).

**A**

¶66      Glassel contends that A.R.S. §§ 13-703(E) and 13-703.01(G) are vague because the "sufficiently substantial to call for leniency" standard is not a reliable standard for determining whether to impose the death penalty. *See Ring III*, 204 Ariz. at 544, ¶ 8, 65 P.3d at 925 (recognizing that standardless death sentencing procedures violate the Eight Amendment's prohibition on cruel and unusual punishment) (citing *Furman v. Georgia*, 408 U.S. 238, 239-40 (1972) (per curiam)).

¶67      Glassel argues that the lack of an "identifiable" standard was not as problematic when judges weighed the mitigating factors because judges were more experienced in sentencing matters. *See Proffitt v. Florida*, 428 U.S. 242, 252 (1976) ("[J]udicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases."). According to Glassel, jurors, with no such prior experience to guide them, "will inevitably err."

¶68      We have long held, however, that the phrase "sufficiently substantial to call for leniency" is not unconstitutionally vague. *See State v. Ortiz*, 131 Ariz. 195,

- 34 -

206, 639 P.2d 1020, 1031 (1980), *overruled, in part, on other grounds by State v. Gretzler*, 135 Ariz. 42, 57 n.2, 659 P.2d 1, 16 n.2 (1983). The fact that juries, instead of judges, now determine whether any mitigating evidence is sufficiently substantial to call for leniency does nothing to change that analysis. Although jurors may not have the experience of judges in weighing mitigating factors against aggravating circumstances, because this process is "inherently subjective" and not subject to any "mathematical formula," *Hoskins*, 199 Ariz. at 154, ¶ 123, 14 P.3d at 1024, our previous decisions in the context of judicial sentencing compel the same conclusion under the new sentencing statutes.

**B**

**¶69**     *In re Winship*, 397 U.S. 358, 361-63 (1970), requires that every element of an offense be proven beyond a reasonable doubt. Glassel points out that *Ring II*, 536 U.S. at 589, requires that the state prove to the jury beyond a reasonable doubt every fact necessary to impose the death penalty. Glassel concludes, therefore, that the state has the burden of proving "beyond a reasonable doubt that leniency was *not* justified."

**¶70**     The Supreme Court, however, has rejected a similar argument. *See Walton v. Arizona*, 497 U.S. 639, 650 (1990) ("So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the

offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency."), *overruled on other grounds by Ring II*, 536 U.S. 586-87; *see also State v. Atwood*, 171 Ariz. 576, 663, 832 P.2d 593, 680 (1992) ("Placing the burden on the defendant to prove mitigating circumstances is not a violation of due process."), *overruled on other grounds by State v. Nordstrom*, 200 Ariz. 229, 241, ¶ 25, 25 P.3d 717, 729 (2001). *Ring II* does not hold to the contrary; it merely addressed the implications of permitting a trial court, rather than a jury, to determine the existence of aggravating circumstances and overruled *Walton* only to the extent that *Walton* found that practice permissible. *See Ring II*, 536 U.S. at 597 n.4. Accordingly, Glassel's contention that the state has the burden of proving that the mitigating factors were not sufficiently substantial to call for a life sentence is without merit.

### C

**¶71** Glassel also asserts that A.R.S. §§ 13-703(E) and 13-703.01(G) are unconstitutional because they create a "presumption of death which the jury is then called upon to rebut."

**¶72** A conviction for first degree murder, however, does

not create a presumption of death. In addition to the elements of the crime, the state must prove at least one aggravating factor beyond a reasonable doubt in order to obtain a death sentence. Only after the state establishes at least one aggravating factor beyond a reasonable doubt does the defendant have the burden of proving mitigating circumstances. Such a scheme does not create an unconstitutional "presumption of death." *See State v. Anderson*, 210 Ariz. at 347, ¶¶ 76-77, 111 P.3d at 389 (citing cases).

**X**

¶73    Glassel next claims that the trial court improperly reduced the State's burden when it refused to instruct the jury to return a life sentence if it had a reasonable doubt whether to impose the death penalty.[10] He argues that the trial court's failure to so instruct the jury violated his rights "to fundamental fairness and due process of law under the Fifth, Sixth, Eighth and Fourteenth Amendments [to the United States Constitution]."

¶74    We review *de novo* whether instructions to the jury properly state the law. *State v. Orendain*, 188 Ariz. 54, 56, 932 P.2d 1325, 1327 (1997). If an instruction improperly

_____

[10]    Glassel asked that the following instruction be read to the jury:    "If a juror has a reasonable doubt about whether the death penalty or the death sentence should be imposed, that juror should not vote for the death penalty."

reduces the state's burden of proof, the error is structural and cannot be harmless. *See Sullivan v. Louisiana*, 508 U.S. 275, 280-82 (1993); *Portillo*, 182 Ariz. at 594, 898 P.2d at 972.

¶75    We reject this argument for the same reasons we rejected his argument that the state has the burden of "proving beyond a reasonable doubt that leniency was *not* justified." *See* ¶¶ 69-70 (citing *Walton*, 497 U.S. at 650; *Atwood*, 171 Ariz. at 663; and *Ring II*, 536 U.S. at 597 n.4).  Therefore, the trial court did not err by refusing to instruct the jury to return a life sentence if it had a reasonable doubt whether to impose the death penalty.

## XI

¶76    Glassel asserts that the prosecutors committed misconduct by stating in *voir dire* that the State could put on mitigating evidence, but then failed to provide jurors with evidence of Glassel's mental illness.  "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Hughes*, 193 Ariz. 72, 79, ¶ 26, 969 P.2d 1184, 1191 (1998) (internal quotation omitted).  Glassel did not make this argument in the trial court and therefore we review only for fundamental error.  *State v. Montaño*, 204 Ariz. 413, 427 n.6, ¶ 70, 65 P.3d 61, 75 n.6 (2003).

¶77     We discern no fundamental error here.  Glassel's counsel had access to the very mitigation evidence at issue, yet failed to present it after urging by the State.  Under these unique circumstances, we cannot find that the State engaged in misconduct by failing in effect to counter what it may have considered to be defense counsel's strategy by introducing evidence that he declined to present.

## XII

¶78     Glassel next contends that the victim impact statements "exceeded permissible bounds of relevance, were unduly prejudicial, and violated appellant's due process rights, and his right to a fair sentencing under the Fifth, Sixth, Eighth, and Fourteenth Amendments . . . as well as Article 2, §§ 4, 15, and 24 of the Arizona Constitution."  We review issues regarding the interpretation of federal and Arizona constitutional provisions *de novo*.  *State v. McCann*, 200 Ariz. 27, 28, ¶ 5, 21 P.3d 845, 846 (2001).

### A

¶79     Three people[11] gave victim impact statements on behalf of Nila Lynn: Duane Lynn and Nila's daughters, Kathy Morgan and Patty Wyatt, all of whom cried during their presentations.

---

[11]   A cousin of Esther LaPlante's was designated Esther's legal representative and delivered a victim impact statement on the family's behalf.  Glassel does not raise any challenge to this statement.

Duane said that he had the privilege and honor to be married to Nila for nearly fifty years. He described how his children had been secretly planning an anniversary party but ended up using the money that they had saved for Nila's casket. He then told the jury how much he loved his wife and how much he missed her. He also told the jury about the day of the murder, when Nila begged him to help her as she lay dying. Duane said that he had always been able to help her but was powerless to do anything that day. He concluded by showing twenty-five pictures of Nila and her family to the jury.

¶80    Kathy Morgan testified that her mother was a religious woman and a good person. Morgan also testified that the night before the murder, she watched a television program about the anniversary of the murders at Columbine High School. She said that she remembered feeling sorry for the families but never imagined that just twenty-four hours later she would experience the same pain.

¶81    Patty Wyatt testified that her mother helped her get through a difficult period of her life when her roommate, Sydney Brown, was murdered. Wyatt described how a man walked into a church one night and "put a bullet into [Brown's head] and killed her along with six others." She said that nothing could have prepared her for sitting through another funeral just seven months later. She also said that while other first-graders were

drawing stick figures with flowers, her first-grader "draws Nana with a bad man and a gun."

**B**

¶82        "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant . . . as to whether or not the death penalty should be imposed."  *Payne v. Tennessee*, 501 U.S. 808, 827 (1991)**.**   Arizona permits victim impact evidence to rebut a defendant's mitigation evidence.  *State v. Mann*, 188 Ariz. 220, 228, 934 P.2d 784, 792 (1997) ("Arizona has made [the choice to allow victim impact statements] and thus, under the Arizona Constitution, and to the extent allowed by *Payne* and our cases, victim impact evidence should be considered by the court to rebut the defendant's mitigation evidence.").

¶83        The Supreme Court has cautioned, however, against unduly prejudicial victim impact statements:  "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."  *Payne*, 501 U.S. at 825.  In *Payne*, the defendant had murdered twenty-eight-year-old Charisse Christopher and her two-year-old daughter, Lacie.  *Id.* at 811.  Christopher's three-year-old son, Nicholas, survived the brutal attack after seven hours of surgery and a massive blood transfusion.  *Id.* at 812.  At

sentencing, the trial court permitted Nicholas' grandmother to explain how Nicholas had told her that he missed his mother and baby sister. *Id.* at 826. The Court determined that the grandmother's statements were not unduly prejudicial. *Id.* at 826-30.

¶84    Glassel argues that the victim impact statements here were much more prejudicial than was the grandmother's statement in *Payne*. According to Glassel, the statements by Lynn's daughters were unduly prejudicial because they "impermissibly injected into the proceedings the emotional baggage connected to two mass murders – one well-known to the public, the other having an exceedingly personal connection to the woman who told of it."

¶85    Glassel adds that the prejudicial effect of the Lynn family's testimony "was exacerbated by the fact that all three of the individuals listed above were weeping during their presentations." Glassel further claims that the prejudicial effect of the Lynn family's testimony "is illustrated by the fact that at least half of the jurors were weeping during the victim impact presentation."

¶86    Although Morgan's and Wyatt's statements were powerful and emotional, we cannot conclude that they unconstitutionally prejudiced the jury. The fact that the family members and jurors cried during the presentations does not warrant reversal.

Senseless murders usually generate strong emotional responses. It is not unreasonable, therefore, to expect that murder victims' family members will often come to tears when making their impact statements. Nor is it unreasonable to expect that some jurors will also have emotional reactions when hearing the victims' families' accounts of the loss they have suffered.

### XIII

¶87    Glassel argues that the trial court erred by not permitting Duane Lynn to recommend a life sentence. Our review of whether a victim's sentencing recommendation in a capital case is relevant turns on the question of whether the recommendation "creates a constitutionally unacceptable risk that jurors may impose a death sentence based upon impermissible arbitrary and emotional factors." *Lynn v. Reinstein*, 205 Ariz. 186, 190 n.5, ¶ 13, 68 P.3d 412, 416 n.5 (2003) (citations omitted); *see also State v. Sansing*, 206 Ariz. 232, 241, ¶ 37, 77 P.3d 30, 39 (2003) (citations omitted).

¶88    Duane Lynn opposed the death penalty in this case not because he opposed it in principle, but because he did not believe that it was warranted under the circumstances of this case. We previously decided, however, that Lynn could not give a recommendation for a life sentence, holding that the Eighth Amendment prohibits a victim from making a sentencing recommendation to the jury in a capital case. *See Lynn*, 205

Ariz. at 188, ¶ 5, 68 P.3d at 414. We further commented that "[v]ictims' recommendations to the jury regarding the appropriate sentence a capital defendant should receive are not constitutionally relevant to the harm caused by the defendant's criminal acts or to the defendant's blameworthiness or culpability." *Id*. at 191 ¶ 17, 68 P.3d at 417 (citations omitted).

¶89 Nevertheless, Glassel argues that this Court should revisit the issue from his perspective. Glassel agrees that the Eighth Amendment bars a victim from recommending a death sentence when the defendant objects to that recommendation. He claims, however, that the Eighth Amendment "cannot bar a recommendation of leniency when the defendant affirmatively wishes the jury to hear it." He further asserts that "rights under the Eighth Amendment are the defendant's to raise or waive, not for the trial court to impose against his will."[12]

¶90 Glassel contends that permitting victims to give recommendations of leniency is especially important when those victims present victim impact statements. According to Glassel, the natural inference from a victim impact statement is that the victim *supports* imposing the death penalty.

---

[12] Glassel contends that the trial court's error involves both Nila Lynn *and* Esther LaPlante. According to Glassel, if the jury heard that Duane Lynn recommended a life sentence, and then decided to give him a life sentence for Nila's murder, it would be pointless to impose the death penalty for Esther's murder.

¶91    However, as we have previously held both in *Lynn* and *Sansing*, 206 Ariz. at 241, ¶ 37, 77 P.3d at 39, victims' opinions about what sentence should be imposed in a capital case are constitutionally irrelevant.  Although here it is a defendant who argues that a victim's recommendation of leniency should be admitted, the same reasoning applies.  What makes victim statements relevant is the evidence of the impact of the crime.  *See Lynn,* 205 Ariz. at 191, ¶ 17, 68 P.3d at 417.  Thus, a victim's recommendation of what sentence should be imposed in a capital case, whether for or against the death penalty, is simply not relevant.  *Id*.  Accordingly, the trial court did not err in precluding Duane Lynn from recommending that Glassel should receive a life sentence.

## XIV

¶92    Glassel has not urged this Court to overturn his death sentence after independently reviewing the jury's findings of aggravation and mitigation.  However, we must independently review those jury findings regardless of whether Glassel has raised the issue on appeal.  A.R.S. § 13-703.04(A) (Supp. 2004).[13]

---

[13]    Section 13-703.04 "applies to any sentencing or resentencing proceeding on any first degree murder case that is held after the effective date of this act and in which the offense was committed before the effective date of this act." 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 7(b).

¶93     The language of section 13-703.04 is identical to superseded A.R.S. § 13-703.01 (1994), which required us independently to reweigh mitigating and aggravating factors when judges determined whether to impose the death penalty.  Under the superseded statute, we rejected a rigid mathematical approach to reweighing, holding that "[i]n weighing, we consider the quality and the strength, not simply the number, of aggravating and mitigating factors."  *State v. Greene*, 192 Ariz. 431, 443, ¶ 60, 967 P.2d 106, 118 (1998).

¶94     In *Greene*, although there was only one aggravator and several mitigators, we determined that the mitigation was not sufficient to overcome the aggravation.  *Id.* at 443-44, ¶ 60, 967 P.2d at 118-19.  We thus upheld the death sentence.  *Id.* at ¶¶ 60-63.  In other cases we have likewise focused on the quality, not the quantity, of the proven aggravating and mitigating factors.  *See, e.g.*, *State v. Rogovich*, 188 Ariz. 38, 44-46, 932 P.2d 794, 800-02 (1997) (holding that the quality of the three aggravators outweighed the quality of the six mitigators and thus death penalty was appropriate); *State v. Lehr*, 201 Ariz. 509, 522-24, ¶¶ 62-66, 38 P.3d 1172, 1185-86 (2002) (holding that the quality of the aggravators outweighed the quantity of the more numerous mitigators and thus death penalty was appropriate).

¶95     Our independent reweighing is not complicated in this case.  The aggravating factor, that two or more murders were committed during the commission of the offense, A.R.S. § 13-703(F)(8), was uncontested.  The mitigating circumstances offered by Glassel - his age, lack of criminal history, and lack of prior violent crimes - were, in light of the aggravating factor, not "sufficiently substantial to warrant leniency."  *See Roseberry*, 210 Ariz. at ___, ¶¶ 78-79, 111 P.3d at 416.

**XV**

¶96     The jury also convicted Glassel of thirty counts of attempted first degree murder, all class two felonies.  The jury further found each offense to be a dangerous offense because a deadly weapon had been used, which enhanced the sentence for each offense.  A.R.S. § 13-604(I).  Under section 13-604(I), the presumptive sentence for a class two dangerous felony is ten and one-half years.  However, "[t]he presumptive term may be mitigated or aggravated pursuant to the terms of § 13-702 subsections B, C, and D."  *Id*.  The minimum sentence for a class two dangerous felony is seven years and the maximum sentence is twenty-one years.  *Id*.

¶97     When Glassel committed his crimes, section 13-702(C) (Supp. 1999) listed seventeen different factors that a court was required to consider in deciding an appropriate sentence.  Such factors included the following: "[u]se, threatened use or

possession of a deadly weapon . . . during the commission of the crime," § 13-702(C)(2); "[t]he physical, emotional and financial harm caused to the victim," § 13-702(C)(9); "[if] the victim of the offense is sixty-five or more years of age," § 13-702(C)(13); and "[a]ny other factors which the court may deem appropriate to the ends of justice," § 13-702(C)(17).[14]

¶98    The trial court imposed aggravated sentences on each count:  the maximum term of twenty-one years for counts three, four and five, and an aggravated term of eighteen years for the remaining counts.[15]    In explaining his decision to impose aggravated sentences, the trial judge found the following aggravators:  "multiple victims, the harm of the defendant's actions to the victims, the age of the victims, deadly weapon used, [and] the circumstances surrounding the crime . . . ."[16] The judge found that these circumstances far outweighed the

---

[14]    This latter provision is now found in A.R.S. § 13-702(C)(21) (Supp. 2004). *See* 2004 Sess. Laws, 2d Reg. Sess., ch. 174, § 1. *But see infra* note 18.

[15]    The trial judge ordered that some counts run consecutively to others, but concurrently to each other.  On appeal, Glassel does not contest the court's imposition of consecutive sentences.

[16]    The trial court did not specify what factors applied to any specific counts. *See State v. Gillies*, 142 Ariz. 564, 573, 691 P.2d 655, 664 (1984) (commenting that "[t]he better practice, in cases like this of multiple counts, is to set out the aggravating and mitigating factors for each separate count"). Nor did the court make specific references to A.R.S. § 13-702(C) when it sentenced Glassel on the non-capital convictions.

mitigating factors of Glassel's age and lack of prior convictions.

¶99 In a supplemental brief filed after the Supreme Court issued its opinion in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), Glassel challenges the aggravated sentences he received for his non-capital offenses.

¶100 Before *Blakley*, in *Apprendi v. New Jersey*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). The Court in *Blakley* applied the *Apprendi* rule to the State of Washington's sentencing scheme. 542 U.S. at ___, 124 S. Ct. at 2536. It concluded that the sentence Blakely received violated the rule announced in *Apprendi*. *Blakely*, 542 U.S. at ___, 124 S. Ct. at 2538. The Court emphasized that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Id*. at ___, 124 S. Ct. at 2537. We have held that *Blakely* applies to Arizona's non-capital sentencing scheme. *State v. Brown (McMullen)*, 209 Ariz. 200, 203, ¶ 12, 99 P.3d 15, 18 (2004) (holding that, under Arizona law, the statutory maximum for *Apprendi* purposes in a case in which no aggravating factors have been proved to a jury

beyond a reasonable doubt is the presumptive sentence).

¶101    Glassel contends that except for the finding that there were multiple victims, the aggravating factors found by the trial judge were neither implicit in the jury verdicts nor admitted by Glassel.[17]    He argues, therefore, that the trial court sentenced him on the non-capital offenses in violation of *Blakely* because there was no jury finding beyond a reasonable doubt on all of the aggravating circumstances.  Glassel did not raise this objection at trial and our review is therefore only for fundamental error.  *See State v. Henderson*, ___ Ariz. ___,

---

[17]    We note that because Glassel's use of a deadly weapon was used to enhance the range of punishment under section 13-604(I), the trial court erred in relying on Glassel's use of a deadly weapon as an aggravating circumstance.  *See* A.R.S. § 13-702(C)(2).    Moreover, the factors of harm of the defendant's actions to the victims, the age of the victims, and the circumstances surrounding the crime, were neither factors found by the jury beyond a reasonable doubt nor implicit in all of the jury's verdicts.  For example, although three of the attempted murder victims had been hit by bullets from the weapons Glassel used, the others were not.  In addition, the record does not establish that all of the victims of the attempted first degree murder counts were more than sixty-five years old.  A.R.S. § 13-702(C)(13).    Nor did the court specify if any of the victims were sixty-five years old or more.  *See Gillies*, 142 Ariz. at 573, 691 P.2d at 664.  And the court did not explain what it meant by "the circumstances of the offense."  *Cf*. A.R.S. § 13-703(C)(5) (listing as an aggravating circumstance the "[e]specially heinous, cruel or depraved manner in which the offense was committed").  Glassel, however, has waived these issues by not raising them at trial or on appeal.  *Cf. State v. Wilson*, 200 Ariz. 390, 398, ¶ 24, 26 P.3d 1161, 1169 (App. 2001) (rejecting argument made at oral argument in part because it was not presented either in the trial court or in the appellate briefs) (citing *Van Loan v. Van Loan*, 116 Ariz. 272, 274, 569 P.2d 214, 216 (1977)).

\_\_\_ ¶ 19, 115 P.3d 601, \_\_\_ (2005).

**¶102**      Our recent decision in *State v. Martinez*, \_\_\_ Ariz.
\_\_\_, 115 P.3d 618 (2005), disposes of Glassel's arguments.  In
*Martinez*, we concluded that "once a jury finds or a defendant
admits a single aggravating factor, the Sixth Amendment permits
the sentencing judge to find and consider additional factors
relevant to the imposition of a sentence up to the maximum
prescribed in that statute."  *Id*. at \_\_\_, ¶ 26, 115 P.3d at \_\_\_.

**¶103**      Section 13-702(C) does not list "multiple victims" as
an  aggravating  factor.      Rather,  the  "multiple  victims"
aggravating factor for non-capital offenses is a court-created
factor  that  has  been  held  to  fall  within  the  "catch-all"
provision of A.R.S. § 13-702(C)(17) ("Any other factors which
the court may deem appropriate to the ends of justice.").[18]  *See*
*State v. Tschilar*, 200 Ariz. 427, 434-36, ¶¶ 30-34, 27 P.3d 331,
338-40 (App. 2001).   The court in *Tschilar* reasoned that a
defendant who assaults more than one victim at once "arguably
creates a greater risk of physical and emotional injury as to
each as they see the others terrorized or injured and arguably
represents a graver offense to society."   *Id*. at 435, ¶ 34, 27
P.3d at 339.   *But cf. State v. Alvarez*, 205 Ariz. 110, 114, ¶

---

[18]    No issue is raised on appeal as to whether the A.R.S. § 13-
702(C)(21), the "catch all" circumstance, violates due process,
and therefore we do not address it, particularly because the
statute has now been changed, effective August 12, 2005.  *See*
2005 Sess. Laws, ch. 20, § 1.

13, 67 P.3d 706, 710 (App. 2003) (holding that the trial court erred in imposing aggravated sentences on the basis of "multiple victims" under the facts of that case because the defendant "did not have 'multiple victims' in the sense in which that term is normally used, denoting multiple victims of a single act, episode, or scheme") (citations omitted).

¶104    Other than arguing that the trial court committed *Apprendi/Blakely* error by not requiring the jury to find all aggravating factors, Glassel does not contest the trial court's reliance on the multiple victims' aggravator. Nevertheless, failure to submit the multiple victims issue to the jury was not *Blakely* error because the jury's verdicts necessarily found that there were 30 victims; and Glassel cannot establish that any reasonable jury would have found that each was not placed in increased danger. And because Glassel does not challenge the trial court's use of any of the other aggravating circumstances, his claim that the trial court's imposition of aggravated sentences violated the holding of *Blakely* fails.

**XVI**

¶105    To preserve the issues for future federal *habeas corpus* proceedings, Glassel contends that the death penalty is unconstitutional for thirteen reasons. He acknowledges that this Court has already rejected these thirteen arguments, but asks us to reconsider them.

¶106    First, Glassel argues that the death penalty is cruel and unusual punishment under any circumstance. Both the Supreme Court and this Court have rejected that argument. *Gregg v. Georgia*, 428 U.S. 153, 186-87 (1976); *State v. Harrod*, 200 Ariz. 309, 320, ¶¶ 58-59, 26 P.3d 492, 503 (2001) (holding that "[t]he Arizona death penalty is not per se cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments") (citations omitted), *vacated on other grounds by Harrod v. State*, 536 U.S. 953 (2002).

¶107    Second, he contends that the death penalty is imposed arbitrarily and irrationally. We rejected the same argument in *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988) (citations omitted).

¶108    Third, Glassel asserts that the application of the death penalty under these facts constitutes cruel and unusual punishment. But he does not say why the death penalty would constitute cruel and unusual punishment under these facts. His failure to make any specific argument precludes any further consideration of this point. *See State v. Carreon*, 210 Ariz. 54, 76, ¶ 123, 107 P.3d 900, 922 (2005); *State v. Kemp*, 185 Ariz. 52, 57, 912 P.2d 1281, 1286 (1996) (holding that counsel, to avoid preclusion of issue on appeal, must argue issue in body of brief; list of issues in brief is not adequate).

¶109    Fourth, he argues that because the prosecution's

discretion to seek the death penalty has no standards, the death penalty violates the Eighth and Fourteenth Amendments and Article 2, sections 1, 4, and 15 of the Arizona Constitution. We rejected the same argument in *State v. Sansing*, 200 Ariz. 347, 361, ¶ 46, 26 P.3d 1118, 1132 (2001), *vacated on other grounds by Sansing v. Arizona*, 536 U.S. 954 (2002).

¶110    Fifth, Glassel contends that Arizona's death penalty discriminates against poor, young, and male defendants.  We have previously rejected that argument.  *Sansing*, 200 Ariz. at 361, ¶ 46, 26 P.3d at 1132; *State v. Poyson*, 198 Ariz. 70, 83, ¶ 53, 7 P.3d 79, 92 (2000); *State v. Stokley*, 182 Ariz. 505, 516, 898 P.2d 454, 465 (1995).

¶111    Sixth, he argues that the absence of proportionality review of death sentences denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment.  We rejected that argument in *Harrod*, 200 Ariz. at 320, ¶ 65, 26 P.3d at 503.

¶112    Seventh, Glassel claims that Arizona's capital sentencing scheme is unconstitutional because it does not require the state to prove that the death penalty is appropriate.  We rejected the same argument in *State v. Ring*, 200 Ariz. 267, 284, ¶ 64, 25 P.3d 1139, 1156 (2001) (*Ring I*), *rev'd on other grounds by Ring II*, 536 U.S. 584; *see also State v. Van Adams*, 194 Ariz. 408, 423, ¶ 55, 984 P.2d 16, 31 (1999).

- 54 -

¶113    Eighth, he contends that A.R.S. § 13-703.01 is unconstitutional because it provides no objective standards to guide the jury in weighing the aggravating and mitigating circumstances.  We rejected that argument, at least when judges weighed aggravating and mitigating factors, in *State v. Pandeli*, 200 Ariz. 365, 382, ¶ 90, 26 P.3d 1136, 1153 (2001), *vacated on other grounds by Pandeli v. Arizona*, 536 U.S. 953 (2002).  Our analysis remains unchanged now that juries, instead of judges, weigh aggravating and mitigating factors.

¶114    Ninth, Glassel argues that Arizona's death penalty scheme is unconstitutional because it does not require the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances. We rejected the same argument in *Pandeli*, 200 Ariz. at 382, ¶ 92, 26 P.3d at 1153.

¶115    Tenth, he maintains that the Arizona death penalty scheme is unconstitutional because the broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder.  We rejected the same argument in *Pandeli*, 200 Ariz. at 382, ¶ 90, 26 P.3d at 1153.

¶116    Eleventh, Glassel contends that lethal injection is cruel and unusual punishment.  We rejected that argument in *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

¶117    Twelfth, he argues that Arizona's death penalty is

unconstitutional because it requires the death penalty whenever at least one aggravator exists and no mitigating factors exist. We rejected the same argument in *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

¶**118** Finally, Glassel claims that Arizona's death penalty is unconstitutional because it requires defendants to prove that their lives should be spared. We rejected that argument in *State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988).

## XVII

¶**119** For the above reasons, we affirm Glassel's convictions and sentences.

_____
Michael D. Ryan, Justice


CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Andrew D. Hurwitz, Justice


_____
Charles E. Jones, Justice (Retired)